865 A.2d 711 (2005)
374 N.J. Super. 475
Vincent DONATO and Gina A. Calogero, Plaintiffs-Appellants, and
Eric Obernauer and Lawrence R. Campagna, Plaintiffs,
v.
Stephen MOLDOW, Defendant/Third-Party Plaintiff-Respondent, and
John Does 1-40 and Jane Does 1-20, Defendants,
v.
Kenneth Hoffman, Third-Party Defendant.
Superior Court of New Jersey, Appellate Division.
Submitted October 14, 2004.
Decided January 31, 2005.
*712 Gina A. Calogero, Hackensack, attorney for appellants (Ms. Calogero, of counsel and on the brief).
Skrod & Baumann, attorneys for defendant/third-party plaintiff-respondent Stephen Moldow (Richard E. Mahoney, on the brief).
Before Judges CONLEY, LISA and WINKELSTEIN.
The opinion of the court was delivered by
*713 LISA, J.A.D.
We consider in this case the potential liability of the operator of an electronic community bulletin board website based on allegedly actionable messages posted anonymously by others. Appellants, Vincent Donato and Gina A. Calogero, elected members of the Emerson Borough Council, sued the website operator, defendant Stephen Moldow, and numerous fictitious parties, identifying them by the pseudonyms they used when posting their messages. The primary thrust of the complaint against Moldow was that the messages constituted defamation, harassment and intentional infliction of emotional distress,[1] and that Moldow was liable for damages because he was the publisher. The trial judge found that Moldow was immune from liability under a provision in the Communications Decency Act of 1996, 47 U.S.C.A. § 230, and granted Moldow's motion to dismiss the complaint against him for failure to state a claim upon which relief can be granted. We affirm.

I
Moldow established the website, known as "Eye on Emerson," in late 1999. He posted information about local government activities, including, for example, minutes of meetings of the borough council, planning board and board of education. Public opinion polls were conducted on the site, which included approval ratings of local elected officials. The site included a discussion forum, in which any user could post messages, either with attribution or anonymously.
Initially, appellants favored the Eye on Emerson website, believing it provided a good source of community information and citizen participation. But, beginning in early 2001, many negative messages about appellants were posted. Some concerned the discharge of their official duties. Others were personal. Many were vile and derogatory in their language and tone. We give a few examples, taken directly from the complaint:
A false message from "my window is not a peep show" posted July 4, 2001 falsely claiming that Donato climbed a ladder to the author's bedroom window and was videotaping him or her with a camera while he/she was dressing;
False statements by "Doctor in the House" that plaintiff Donato was emotionally and mentally unstable and in need of psychiatric help, ready to explode and should be on medication;
....
A false statement by "Concerned Resident" on or about June 13, 2001 claiming that [ ] and Calogero "do drugs;"
....
Various false statements including a message from "Investigator" falsely claiming that Donato and Calogero "use police reports against the residents" and claiming that Donato and Calogero abused their authority over the Emerson Police Department and violated Department Rules and Regulations and/or state laws;
Messages from "RM," "Insider Investigator" and "Ron" on various dates falsely accusing Donato and Calogero of stealing files and other public records from borough hall and accusing Calogero *714 of violating police department policies;
....
Messages from "Voter," "Resident Informed," "Duped Again," "Tommy Boy" and others calling Donato a "slippery slimy fish," "hate mongering political boob," "slime of a thing," "Hitler reborn," an "evil bitter old man," "sneak and a liar," "sleeze." "vermin," "a-hole;"
....
Messages from "Jackie" and others calling Calogero a "piece of sh  ," "this Bitch," "corrupt influence," "Queen of Hate," "witch," "fashion violation," "nut case," claiming that she "hasn't told the truth since she was sworn into office" and other harsh and offensive comments.
The complaint alleged that Moldow and the fictitiously-named anonymous posters published the statements knowing they were false, with actual malice, and with intent to injure and cause emotional distress to appellants, who sought damages for loss of esteem in the community, damage to their reputation, and physical and mental pain and suffering. We recognize that some of the statements may be non-actionable, consisting merely of unpleasant name-calling and expressions of opinions, particularly when directed at public figures.[2] For purposes of our analysis, we assume that some of the statements are actionable, particularly under the extremely deferential standard applicable to motions to dismiss on the pleadings. See Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 766-67, 563 A.2d 31 (1989). We will refer to them generically as "defamatory statements."
Of course the authors of the defamatory statements would be liable to appellants upon proof of all elements of the cause of action. Their potential liability is not before us. Appellants took steps in the trial court to ascertain the identity of the fictitious parties. Immediately upon filing the action they issued a subpoena duces tecum to FreeTools.com, trading as VantageNet, Inc., which was the electronic host of the Eye on Emerson bulletin board, seeking the Internet Protocol (IP) address of each anonymous poster.
The fictitious parties, without divulging their identities, engaged counsel, who moved to quash the subpoena. The American Civil Liberties Union and Public Citizen Litigation Group, by leave granted, intervened as amicus curiae. Because appellants failed to comply with the procedures required by Dendrite Int'l, Inc. v. John Doe No. 3, 342 N.J.Super. 134, 141-42, 775 A.2d 756 (App.Div.2001), and for other reasons, the trial judge granted the motion to quash. But he denied as premature the motion of the fictitious parties to dismiss the complaint against them. Thus, appellants were not deprived of the opportunity to continue in their attempt to identify the anonymous posters. Eventually, however, appellants abandoned their efforts and voluntarily dismissed their claim with prejudice against the fictitious defendants.
In argument before the trial court, appellants expressed their suspicion that Moldow might have authored some of the defamatory statements posted under pseudonyms. They argued they should be permitted discovery to pursue their suspicion and perhaps engage the services of a linguistics expert. Thus, they argued dismissal *715 of their claim against Moldow was premature and must abide discovery. The judge rejected the argument, concluding that if appellants satisfied the Dendrite test as to any anonymously posted messages, they would be entitled to obtain the identifying information of the poster, whoever, including Moldow, it might be. At that point in the proceedings, the trial judge refused to dismiss against the fictitious defendants.
As we have stated, appellants did not pursue their Dendrite remedies or otherwise determine the identity of any of the anonymous posters. In their appellate brief, appellants acknowledge that they have not appealed the part of the order that "dismissed Moldow from the claim that he had posted anonymously ... because they dismissed all claims against the anonymous defendants...." Appellants thus concede that "if it were later determined that Moldow was actually the author of any of the anonymous messages, plaintiffs would be precluded from suing him."
Therefore, appellants' contention on appeal is limited to their position that Moldow should be potentially liable because he published defamatory statements made by third parties. Appellants premise their appeal arguments on the assertion that the trial judge in effect converted the motion to dismiss into a motion for summary judgment because he considered matters outside the pleadings. Appellants then argue (1) because discovery was incomplete the matter was not ripe for summary judgment and (2) because material fact issues existed regarding Moldow's conduct, his status as an information content provider, and whether he exercised good faith in editing, the court erred in finding immunity under § 230 and granting dismissal or summary judgment.
A motion to dismiss a complaint under Rule 4:6-2(e) for failure to state a claim upon which relief can be granted must be evaluated in light of the legal sufficiency of the facts alleged in the complaint. Printing Mart, supra, 116 N.J. at 746, 563 A.2d 31. The court must view the allegations with great liberality and without concern for the plaintiff's ability to prove the alleged facts. Ibid. The plaintiff should receive the benefit of every reasonable inference of fact. Ibid. If, on a Rule 4:6-2(e) motion, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided by R. 4:46, and all parties shall be given reasonable opportunity to present all material pertinent to such a motion." R. 4:6-2.
The judge heard Moldow's Rule 4:6-2(e) motion on the same return date as several other motions in this case, including the motion to quash the subpoena and the motion to dismiss against the fictitious defendants. The judge received certifications with many attached documents pertinent to the other motions. During the lengthy oral argument, there was considerable discussion about those materials. However, counsel for Moldow and amicus curiae narrowly tailored their arguments regarding Moldow's dismissal motion to the facts alleged in the complaint. The judge issued a written decision deciding the various motions. In the portion of the decision deciding Moldow's motion, he did not refer to or rely on any matters outside the pleadings. We therefore reject appellants' contention that the motion judge treated this as a summary judgment motion.
Our review of a motion to dismiss for failure to state a cause of action is governed by the same standard as that applied by the trial court. Seidenberg v. *716 Summit Bank, 348 N.J.Super. 243, 250, 791 A.2d 1068 (App.Div.2002). We therefore consider, and accept as true, the facts alleged in the complaint to ascertain whether they set forth a claim against Moldow upon which relief can be granted.

II
Appellants' overriding allegation against Moldow is that he is liable as a publisher of the defamatory statements made by others. They further allege that Moldow was more than passive in his role as publisher, and "has actively participated in selective editing, deletion and re-writing of anonymously posted messages on the Eye on Emerson website and, as such, is entirely responsible for the content of the messages." Appellants elaborate with these factual allegations, by which they argue that Moldow shaped the discussion and thus participated in developing the defamatory statements:
24. The technology is available to require users to register with the webmaster prior to using the discussion forum message board and to identify themselves by name, address and e-mail address; however, Moldow designed the Eye on Emerson website and its discussion forum to allow all users to post messages anonymously.
25. The format of the discussion forum encourages the use of harassing, defamatory, obscene and annoying messages because users may state their innermost thoughts and vicious statements free from civil recourse by their victims.
26. Defendant Moldow controls the content of the discussion forum by various methods, including selectively deleting messages he deems offensive, banning users whose messages he finds "disruptive" to the forum and posting messages to the users who violate his rules of usage. While Moldow is quick to remove any negative message about himself or people he associates with, he allows offensive messages against the plaintiffs and their support[er]s to remain.
27. Moldow actively participates in the editing of messages. By way of example and not limitation, Moldow deleted a message from "the Saint" but not until after several other users complained; he deleted the messages from "Destroyer", "the Champ" and others after Donato and Obernauer threatened litigation; after two days of complaints, he deleted messages from "Football Parent" accusing a former football coach of having sex with female students. Moldow has also deleted messages from "Pee in My Pool" and other users. On May 8, 2001, Moldow said he deleted the post of "Resident Informed" because of profanity but he re-posted an edited version of the message with the profanity partially redacted, thus instructing participants in how to convey offensive language without encountering censorship.
28. Moldow knows the identities of users of the website. On July 15, 2001, he posted a message explaining that "The posts from the author `Ouch,' `Amazed,' `spiderman,' and `Web Master' were removed. All of these messages appear to be from the same person. By the nature of the messages and attempting to impersonate the web master you obviously intended to disrupt the message board. This is not welcome here."
29. On separate occasion in or around April of 2001, plaintiffs Donato and Obernauer met with Moldow individually. Donato and Obernauer showed him downloaded copies of some of the more offensive messages about them and requested three things: (a) the identity of the individuals who posted the offensive, harassing and/or *717 defamatory messages, (b) that Moldow remove the messages and post a disclaimer and (c) that Moldow change the format of the discussion forum to require registration of users so as to discourage any future harassment and defamation.
30. Although Moldow did post a retraction regarding Obernauer and he deleted two offending messages, Moldow stated to Obernauer and Donato that he had no intention of changing the existing format.
In the context of traditional media, such as newspapers and magazines, the publisher of defamatory statements might well be exposed to liability for conduct such as that alleged against Moldow. See, e.g., Kotlikoff v. The Community News, 89 N.J. 62, 65-66, 444 A.2d 1086 (1982). In the context of cyberspace, however, Congress has chosen a different course. It granted a broad immunity to providers or users of interactive computer services with the enactment of § 230. Among the findings and policies supporting its action were these:
(a) Findings
The Congress finds the following:
....
(3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.
(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.
....
(b) Policy
It is the policy of the United States 
....
(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;
(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;
(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material;
....
[47 U.S.C.A. § 230(a), (b).]
Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C.A. § 230(c)(1). This general grant of immunity is then supplemented by the so-called "good samaritan" provision that no provider or user of an interactive computer service shall be held liable on account of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C.A. § 230(c)(2)(A).
An "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet...." 47 U.S.C.A. § 230(f)(2). An "information content provider" is "any person or entity that is *718 responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C.A. § 230(f)(3).
In a clear exercise of its Commerce power, Congress preempted any contrary state law provisions: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C.A. § 230(e)(3). See Zeran v. America Online, Inc., 129 F.3d 327, 334 (4th Cir.1997), cert. denied, 524 U.S. 937, 118 S.Ct. 2341, 141 L.Ed.2d 712 (1998). Because of this provision and Congress' expressed desire to promote unfettered speech on the Internet, the sweep of § 230's preemption includes common law causes of action. Ibid.

III
The dispositive issues on appeal, then, are (1) whether Moldow was a provider or user of an interactive computer service and thus covered by § 230's general immunity provision; (2) whether, by his conduct, Moldow was not also an information content provider with respect to the anonymously-posted defamatory statements; and (3) whether, as a matter of law, Moldow's conduct as described in the complaint did not constitute bad faith within the meaning of § 230's good samaritan provision. Resolution of all three issues in the affirmative results in immunity and renders appellants' claim against Moldow one for which relief cannot be granted.
Section 230 has not been the subject of any reported New Jersey decisions. We look to decisions from other jurisdictions for guidance. Particularly instructive are federal court decisions, to which state courts should give due regard in interpreting a federal statute. Glukowsky v. Equity One, Inc., 180 N.J. 49, 64, 848 A.2d 747 (2004) (citing Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 80, 577 A.2d 1239 (1990)).

A.
By the plain language of § 230 it is clear that Moldow fits the definition of a "provider or user of an interactive computer service." This is so under either of two rationales. He is the provider of a website, Eye on Emerson, which is an information service or system that provides or enables computer access by multiple users to a computer server. Alternatively, he is the user of a service or system, VantageNet, the website's electronic host, that provides or enables access by multiple users to a computer server; he is also, of necessity, the user of an Internet service provider (ISP), which provides him access to the Internet. Our conclusion is supported by the case law interpreting the statutory provisions.
There is no dispute that large, commercial ISPs fit the "interactive computer service" definition. See Ben Ezra, Weinstein, and Co., Inc. v. America Online, Inc., 206 F.3d 980, 985 (10th Cir.), cert. denied, 531 U.S. 824, 121 S.Ct. 69, 148 L.Ed.2d 33 (2000); Zeran, supra, 129 F.3d at 330 n. 2. Website operators are also included. See Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1124 (9th Cir.2003) (subscription-based dating website); Gentry v. eBay, Inc., 99 Cal.App.4th 816, 121 Cal.Rptr.2d 703, 714-15 (Ct.App.2002) (online auction website); Schneider v. Amazon.com, Inc., 108 Wash.App. 454, 31 P.3d 37, 40-41 (2001) (online bookstore website).
It is not relevant to immunity status that the website is not commercially operated or is directed at a relatively limited user base. In Batzel v. Smith, 333 F.3d 1018, 1021 (9th Cir.2003), cert. denied, ___ U.S. ___, 124 S.Ct. 2812, 159 L.Ed.2d 246 *719 (2004), for example, the nonprofit website operator operated in his spare time the website, which provided information about stolen art. The website and listserv mailings generated by the network in Batzel were read by "hundreds" of museum officials, insurance investigators, and law enforcement personnel around the world who were interested in locating stolen art. Id. at 1021-22.
In Schneider, the court succinctly explained how a website operator comes within § 230's immunity provision as a "provider" of an interactive computer service:
But Amazon's web site postings appear indistinguishable from AOL's message board for § 230 purposes. Schneider points out that web site operators do not provide access to the Internet, but this is irrelevant. Under the statutory definition, access providers are only a subclass of the broader definition of interactive service providers entitled to immunity ("provides or enables computer access by multiple users to a computer server, including specifically a service ... that provides access"). [47 U.S.C.A. § 230(f)(2).] According to Schneider's complaint, Amazon's web site enables visitors to the site to comment about authors and their work, thus providing an information service that necessarily enables access by multiple users to a server. This brings Amazon squarely within the definition.
[Schneider, supra, 31 P.3d at 40.]
We agree with this analysis, and it applies to the Eye on Emerson website with the same result.
In Batzel, the court engaged in a similar analysis regarding "provider" status, but then chose to predicate the museum security and stolen art website's immunity on "user" status:
There is, however, no need here to decide whether a listserv or website itself fits the broad statutory definition of "interactive computer service," because the language of § 230(c)(1) confers immunity not just on "providers" of such services, but also on "users" of such services. § 230(c)(1).
There is no dispute that the Network uses interactive computer services to distribute its on-line mailing and to post the listserv on its website. Indeed, to make its website available and to mail out the listserv, the Network must access the Internet through some form of "interactive computer service." Thus, both the Network website and the listserv are potentially immune under § 230.
[Batzel, supra, 333 F.3d at 1030-31 (footnote omitted).]
This reasoning, with which we agree, supports our conclusion that Moldow qualifies as a user, as well as a provider, of an interactive computer service. On either basis, he is covered by the general immunity provision of § 230.

B.
This brings us to the second issue. Appellants contend that by the manner in which Moldow conducted the website he was also an information content provider with respect to the defamatory messages. This would make him an author, for which § 230 does not provide immunity, rather than as a publisher, for which it does. The complaint alleges that Moldow "actively participated in selective editing, deletion and re-writing of anonymously posted messages." Thus, according to appellants, Moldow controls the "content of the discussion." He accomplishes this by posting messages of his own, commenting favorably or unfavorably on messages posted by others, selectively deleting some messages *720 while allowing others to remain, and selectively banning users whose messages he deems disruptive to the forum. He designed the website to allow the posting of messages anonymously without first requiring users to register with him. He edited a message to remove profanity, but then reposted it in redacted form "thus instructing participants in how to convey offensive language without encountering censorship." In this way, according to appellants, Moldow shaped the content provided by others, encouraging and facilitating unfavorable and defamatory statements about them.
In essence, appellants contend that because an "information content provider" includes any person "that is responsible, in whole or in part, for the creation or development of information provided," 47 U.S.C.A. § 230(f)(3), Moldow is included because he is responsible in part for the development of the defamatory statements. We do not agree.
First of all, with respect to any messages posted by Moldow, using his own name or the appellation "Webmaster," he was a content provider. However, appellants have not alleged that any of the statements posted by Moldow were themselves defamatory or otherwise actionable. There is nothing inconsistent or unusual about a website operator being both an interactive computer service provider or user and an information content provider. The two are not mutually exclusive. See, e.g., Batzel, supra, 333 F.3d at 1022 (website operator posted a "moderator's message" commenting on the allegedly defamatory message of a third party). The dual status is irrelevant to immunity, which applies to "any information provided by another information content provider." 46 U.S.C.A. § 230(c)(1) (emphasis added).
Whether Moldow's conduct in "shaping" the content of the discussion forum can be equated with responsibility for the "development" of the defamatory messages requires consideration of Congress' purposes in enacting § 230. In its seminal decision in Zeran, the Fourth Circuit expressed it thusly:
By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service. Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions  such as deciding whether to publish, withdraw, postpone or alter content  are barred.
The purpose of this statutory immunity is not difficult to discern. Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium. The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech. Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum....
None of this means, of course, that the original culpable party who posts defamatory messages would escape accountability.... Congress made a policy choice, however, not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages.

*721 Congress' purpose in providing the § 230 immunity was thus evident. Interactive computer services have millions of users. See Reno v. ACLU, 521 U.S. [844] at 850-51, 117 S.Ct. [2329] at 2334[, 138 L.Ed.2d 874 (1997)] (noting that at time of district court trial, "commercial online services had almost 12 million individual subscribers"). The amount of information communicated via interactive computer services is therefore staggering. The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.
[Zeran, supra, 129 F.3d at 330-31.]
The court continued by explaining the purpose of the good samaritan provision, which grants immunity for voluntary good faith action by a service provider or user "to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C.A. § 230(c)(2)(A). This section was added by Congress to encourage self-regulation and to remove disincentives for self-regulation. The court stated:
Another important purpose of § 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services. In this respect, § 230 responded to a New York state court decision, Stratton Oakmont, Inc. v. Prodigy Servs. Co., 1995 WL 323710 (N.Y.Sup.Ct. May 24, 1995). There, the plaintiffs sued Prodigy  an interactive computer service like AOL  for defamatory comments made by an unidentified party on one of Prodigy's bulletin boards. The court held Prodigy to the strict liability standard normally applied to original publishers of defamatory statements, rejecting Prodigy's claims that it should be held only to the lower "knowledge" standard usually reserved for distributors. The court reasoned that Prodigy acted more like an original publisher than a distributor both because it advertised its practice of controlling content on its service and because it actively screened and edited messages posted on its bulletin boards.
Congress enacted § 230 to remove the disincentives to selfregulation created by the Stratton Oakmont decision. Under that court's holding, computer service providers who regulated the dissemination of offensive material on their services risked subjecting themselves to liability, because such regulation cast the service provider in the role of a publisher. Fearing that the specter of liability would therefore deter service providers from blocking and screening offensive material, Congress enacted § 230's broad immunity "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." 47 U.S.C. § 230(b)(4). In line with this purpose, § 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions.
[Zeran, supra, 129 F.3d at 331.]
*722 Embracing Zeran's construction, other courts have echoed similar principles. In Blumenthal v. Drudge, 992 F.Supp. 44 (D.D.C.1998), the United States District Court for the District of Columbia considered the potential liability of America Online, Inc. (AOL) for an allegedly defamatory statement about Sidney Blumenthal by Matt Drudge, in the Drudge Report, published by AOL pursuant to its licensing agreement with Drudge. The statement was published on the eve of Blumenthal's appointment as an Assistant to the President of the United States. The electronically-published Drudge Report is a gossip column. The court noted that AOL "affirmatively promoted Drudge as a new source of unverified instant gossip," it had the authority under its agreement with Drudge to edit and remove Drudge's submissions, and yet it sought to take no responsibility for any damage Drudge might cause. Id. at 51. That Drudge was not merely an anonymous poster but a known party with whom AOL contracted did not affect AOL's entitlement to § 230 immunity. The court reasoned:
Whether wisely or not, [Congress] made the legislative judgment to effectively immunize providers of interactive computer services from civil liability in tort with respect to material disseminated by them but created by others. In recognition of the speed with which information may be disseminated and the near impossibility of regulating information content, Congress decided not to treat providers of interactive computer services like other information providers such as newspapers, magazines or television and radio stations, all of which may be held liable for publishing or distributing obscene or defamatory material written or prepared by others. While Congress could have made a different policy choice, it opted not to hold interactive computer services liable for their failure to edit, withhold or restrict access to offensive material disseminated through their medium.
[Id. at 49.]
The court rejected Blumenthal's argument that because AOL had the contractual right to exercise editorial control over Drudge's writings it should not enjoy immunity. Referring to the good samaritan provision, the court stated:
But Congress has made a different policy choice by providing immunity even where the interactive service provider has an active, even aggressive role in making available content prepared by others. In some sort of tacit quid pro quo arrangement with the service provider community, Congress has conferred immunity from tort liability as an incentive to Internet service providers to self-police the Internet for obscenity and other offensive material, even where the self-policing is unsuccessful or not even attempted.
[Id. at 52.]
In Ben Ezra, the plaintiff, a publicly traded corporation, sought to impose liability against AOL because it published incorrect information about the plaintiff's stock price and share volume. Ben Ezra, supra, 206 F.3d at 983. The plaintiff contended AOL failed to exercise reasonable care in the manipulation, alteration, and change in the stock information that was submitted to it by two other entities for publication. Ibid. The plaintiff argued that because AOL engaged in ongoing communications with content providers and from time to time deleted inaccurate information about it, AOL's conduct constituted "creation or development" of information and transformed AOL into an information content provider. Id. at 985-86. The Tenth Circuit held that by deleting inaccurate information, AOL "simply made *723 the data unavailable and did not develop or create the stock quotation information displayed," and "was simply engaging in the editorial functions Congress sought to protect." Id. at 986. AOL's communications with the two content providers when errors came to AOL's attention did not "constitute the development or creation of the stock quotation information." Id. at 985. AOL's conduct was within the scope of editorial functions protected by § 230. Id. at 986.
Applying similar reasoning, the Court of Appeals of Washington reached the same result in Schneider, supra, 108 Wash.App. 454, 31 P.3d 37. The court refused to impose liability on Amazon.com because of allegedly defamatory postings by "visitors" to the website about Schneider and his books. Id. at 38. One posting alleged Schneider was a felon. Ibid. When Schneider complained, Amazon acknowledged some of the postings were improper and in violation of its guidelines and agreed to remove them within one or two days, but did not do so. Id. at 38-39. The court held that any failure by Amazon to remove the comments constituted an exercise of editorial discretion immunized by § 230. Id. at 42. The court rejected Schneider's argument that, although Amazon did not create the information about him, because it had the right to edit it and claimed licensing rights in the posted materials, "Amazon in effect became the content provider." Ibid. The court noted that if, as in Ben Ezra,"actual editing does not create liability, the mere right to edit can hardly do so." Id. at 43. Thus, in Schneider, immunity was not defeated by allowing admittedly improper (and potentially actionable) material to remain posted after notice from the offended party and an agreement to remove it.
The Third Circuit followed the same approach in Green v. America Online, 318 F.3d 465 (3d Cir.2003). Green attempted to hold AOL liable for negligently failing to address allegedly defamatory and other harmful conduct directed at him by others in a "chat room" hosted by AOL. Id. at 468-69, 471. The court reasoned that Green was attempting "to hold AOL liable for decisions relating to the monitoring, screening, and deletion of content from its network  actions quintessentially related to a publisher's role. Section 230 `specifically proscribes liability' in such circumstances." Id. at 471 (quoting Zeran, supra, 129 F.3d at 332-33). Addressing Green's contention that the good Samaritan provision violates the First Amendment because it allows a service provider to restrict material deemed inappropriate by the provider "whether or not such material is constitutionally protected," the court found no merit to the contention and stated: "Section 230(c)(2) does not require AOL to restrict speech; rather it allows AOL to establish standards of decency without risking liability for doing so." Id. at 472.
In Batzel, supra, 333 F.3d 1018, the Ninth Circuit expressed its strong agreement with the Zeran approach in construing and applying § 230. The court noted the two-fold purpose of § 230:(1) "to encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce," and, more to the point in the litigation context, "to prevent lawsuits from shutting down websites and other services on the Internet;" and (2) "to encourage interactive computer services and users of such services to self-police the Internet for obscenity and other offensive material...." Id. at 1027-28. The court pointed out the anomaly that would result if the general grant of immunity did not include the good samaritan provision, namely that "[i]f efforts to review and omit third-party defamatory, obscene or inappropriate *724 material make a computer service provider or user liable for posted speech, then website operators and Internet service providers are likely to abandon efforts to eliminate such material from their site." Id. at 1029 (citing legislative history and other authorities).
Factually in Batzel, a third party, Robert Smith, was the content provider of a message accusing Batzel of being a descendant of a high-ranking Nazi official and possessing numerous paintings looted by the Nazis during World War II. Id. at 1021. The operator of the Museum Security Network posted the message, with some minor wording changes, accompanied by a "moderator's message" that "the FBI has been informed of the contents of [Smith's] original message." Id. at 1022. Batzel learned of the posting several months later and complained to the website operator. Ibid. Batzel denied the allegations and contended the defamatory statement caused her harm. Ibid.
The court rejected Batzel's contention that, by his conduct, the website operator in effect was jointly responsible with Smith for creating or developing the message. Id. at 1031. Smith composed the message and thus "created" it, and the website operator's "minor alterations ... or his choice to publish the e-mail" while rejecting others did not "rise to the level of `development.'" Ibid. Providers and users of interactive computer services who "take some affirmative steps to edit the material posted" are protected by § 230, which precludes liability "for exercising the usual prerogative of publishers to choose among proffered material and to edit the material published while retaining its basic form and message." Ibid. The court concluded that "[t]he `development of information' therefore means something more substantial than merely editing portions of an e-mail and selecting material for publication." Ibid.
The Ninth Circuit also decided Carafano, supra, 339 F.3d 1119, in which it rejected the claim that the operator of the subscription-based website, Matchmaker.com, was an information content provider. The website enabled users to locate and communicate with others with compatible romantic interests. Id. at 1121. Members would submit their profile by answering a detailed questionnaire and providing photographs. Many of the questions called for multiple-choice answers. Ibid. Matchmaker policies prohibited members from posting last names, phone numbers or e-mail addresses. Ibid. Before posting the profiles, Matchmaker reviewed the photographs for impropriety, but did not review the profiles themselves. Ibid.
An unknown person, pretending to be Carafano, posted a profile purportedly of her, which included her home address and an indirect means of obtaining her home telephone number. Carafano is a movie and television actress (under a different stage name). The responses to the questionnaire suggested Carafano was promiscuous. She began receiving sexually-explicit and otherwise disturbing phone calls. Id. at 1121-22. Carafano sued Matchmaker, asserting defamation, invasion of privacy, and other claims. The District Court rejected Matchmaker's § 230 immunity defense, finding the company provided part of the profile content, but dismissed the complaint on other grounds. Id. at 1122. The Ninth Circuit affirmed, but did so on the ground that Matchmaker was not an information content provider with respect to the offending content, and was therefore immune under § 230. Id. at 1124-25.
Carafano argued that by providing the questionnaire, which, with the answers *725 provided by a third party, was then posted and became the profile, Matchmaker participated in the development of the information and was thus an information content provider. Carafano pointed to the "pre-prepared responses" of the multiple choice questions, and the structure by which Matchmaker formatted the array of user-supplied information into detailed, searchable personal profiles, thus developing and shaping the content. The court rejected these arguments, stating that so long as the "essential" published content was provided by a third party, "[t]he interactive service provider receives full immunity regardless of the specific editing or selection process." Id. at 1124. "The fact that some of the content was formulated in response to Matchmaker's questionnaire does not alter this conclusion." Ibid.
It did not matter that the questionnaire facilitated the information provided by a third party. The offending content was selected and provided by the third party. Thus, to whatever extent Matchmaker may have been considered an information content provider, because it did not create or develop the "particular information at issue," it was immune from liability under § 230. Id. at 1124-25. The court concluded that "Matchmaker did not play a significant role in creating, developing or `transforming' the relevant information." Id. at 1125.
Our canvass of the decisions interpreting and applying § 230 reveals a common thread. The provision has received a narrow, textual construction, not one that has welcomed creative theories or exhibited judicial creativity. Following this approach and applying these principles to the case before us, we are satisfied that Moldow, by virtue of his conduct, cannot be deemed an information content provider with respect to the anonymously-posted defamatory statements. His status as a provider or user of an interactive computer service garners for him the broad general immunity of § 230(c)(1). That he allows users to post messages anonymously or that he knows the identity of users of the website are simply not relevant to the terms of Congress' grant of immunity. The allegation that the anonymous format encourages defamatory and otherwise objectionable messages "because users may state their innermost thoughts and vicious statements free from civil recourse by their victims" does not pierce the immunity for two reasons: (1) the allegation is an unfounded conclusory statement, not a statement of fact; and (2) the allegation misstates the law; the anonymous posters are not immune from liability, and procedures are available, upon a proper showing, to ascertain their identities. See Dendrite, supra, 342 N.J.Super. at 141-42, 775 A.2d 756.
That Moldow posts messages of his own and participates in the discussion does make him an information content provider with respect to his postings. But no posting of his is alleged to be actionable. The source of potential liability is messages posted by others, and § 230(c)(1) grants him immunity for the content of information provided by "another." Green, supra, 318 F.3d at 470-71.
Appellants claim that Moldow controlled the content of the discussion forum, thus shaping it, as a result of which he was transformed into an information content provider. He accomplished this, according to appellants, by selectively choosing which messages to delete and which to leave posted. These activities, however, are nothing more than the exercise of a publisher's traditional editorial functions, namely, whether to publish, withdraw, postpone or alter content provided by others. Zeran, supra, 129 F.3d at 330. This is the very conduct Congress chose to *726 immunize by § 230. Granting immunity furthers the legislative purpose of encouraging self-regulation to eliminate access to obscene or otherwise offensive materials while at the same time advancing the purpose of promoting free speech on the Internet, without fear of liability. Id. at 335. As stated in Schneider, supra, 31 P.3d at 43, the immunity continues to apply even if the self-policing effort is unsuccessful or not even attempted.
Notice from the offended party that the material is false or otherwise improper does not defeat the immunity. In Zeran, in the days following the Oklahoma City federal building bombing, postings by an unidentified third party on an AOL bulletin board advertised the sale of T-shirts and other items containing offensive and tasteless slogans related to the bombing, directing interested parties to Zeran and listing his home phone number. Zeran, supra, 129 F.3d at 329. Zeran immediately began receiving angry and threatening phone calls. He reported to AOL the falsity of the first message, and when additional similar messages appeared, he continued to complain. Ibid. The court found AOL immune from liability for allegedly delaying in removing the messages, failing to issue retractions, and failing to screen for similar additional postings after being placed on notice that the messages were false and defamatory. Id. at 328-34.
Receipt of such notice thrusts the service provider into the role of a traditional publisher, a role Congress chose to immunize. Id. at 332-33. Allowing liability upon notice would undermine the dual purposes of § 230 and would provide an incentive, rather than disincentive, for the provider to restrict free speech and abstain from self-regulation. Id. at 333. If notice could defeat immunity, anyone in any way "displeased" with posted materials could utilize notice as a "no-cost" means to create the basis for future lawsuits. Ibid. The specter of potential litigation, with its attendant cost and effort, would likely result in shutting down many websites, a result not intended by Congress. Ibid.
Therefore, we are unpersuaded by appellants' contention that Moldow's conduct in removing some messages after receiving complaints, but not removing others, transforms him into an information content provider. Nor does his act of deleting profanity from a posted message and then reposting it in redacted form. This is the very kind of self-regulation envisioned by the good samaritan provision in § 230. Moldow should not be exposed to the risk of liability because he has established his own standards of decency; nor is he potentially liable because of the degree of success he achieved or the effort he exerted to enforce them. See Schneider, supra, 31 P.3d at 43.
Whether Moldow's conduct facilitated the posting of the defamatory messages has no bearing on his immunity status. See Carafano, supra, 339 F.3d at 1124-25. Nor does it matter that Moldow praised some comments favorable to him and ridiculed some comments favorable to appellants, and vice versa. See Gentry, supra, 121 Cal.Rptr.2d at 717. The fact remains that the "essential published content," the defamatory statements, were provided by third parties. Carafano, supra, 339 F.3d at 1124.
It cannot be said that, by the totality of his conduct, as alleged in the complaint, Moldow was responsible, in part, for the creation or development of the defamatory messages. They were created by their authors. Development requires material substantive contribution to the information that is ultimately published. Deleting profanity, selectively deleting or allowing to remain certain postings, and commenting favorably or unfavorably on *727 some postings, without changing the substance of the message authored by another, does not constitute "development" within the meaning of § 230(f)(3).

C.
Finally, we address appellants' contention that the "good faith" requirement of the good samaritan provision has not been established as a matter of law, which would preclude dismissal on the pleadings under Rule 4:6-2(e). The complaint alleges that Moldow admitted "that he had a long-standing resentment against Donato, implying that Donato deserved the treatment he was receiving on the Eye on Emerson website." The complaint also alleges that Moldow posted the defamatory messages with actual malice. Appellants contend that these facts negate good faith on Moldow's part and are sufficient to withstand a Rule 4:6-2(e) dismissal. Appellants point out that none of the reported decisions address the good faith issue, and none dealt with a service provider who knew the plaintiffs and had ill will toward them.
In our view, appellants' argument rests on a misconception about the purpose of the good samaritan provision. It was inserted not to diminish the broad general immunity provided by § 230(c)(1), but to assure that it not be diminished by the exercise of traditional publisher functions. If the conduct falls within the scope of the traditional publisher's functions, it cannot constitute, within the context of § 230(c)(2)(A), bad faith. This principle, although not articulated in the cases we have discussed, is implicit in them. The service provider's conduct in some of the cases could, in a general sense, be characterized as bad faith. E.g., Schneider, supra, 31 P.3d at 38-39 (provider of interactive computer service agreed that one or more postings violated guidelines and should be removed, and promised to take steps to remove the postings within one to two business days, but failed to do so); Zeran, supra, 129 F.3d at 329 (provider of interactive computer service failed to immediately remove an allegedly defamatory posting on its bulletin board after being notified of its existence). But in each case the conduct was found to fall within the scope of the traditional publisher's function, and was therefore subject to immunity.
Nothing more is alleged here. Whether Moldow knew and disliked appellants is not relevant to the immunity terms of § 230. Selective editing and commenting are activities within the scope of the traditional publisher's function. The conclusory allegation that Moldow published the defamatory statements with actual malice is not sufficient to withstand a motion to dismiss on the pleadings. See Printing Mart, supra, 116 N.J. at 767-69, 563 A.2d 31.
We recognize, of course, the basic tenet of statutory construction that the legislature intended the words of a statute to have a meaning that is not superfluous or irrelevant. Phillips v. Curiale, 128 N.J. 608, 618, 608 A.2d 895 (1992). Thus, "good faith" must be ascribed some meaning. In light of the allegations here, however, we need not say any more on the subject. To raise an issue of an absence of good faith, an allegation of conduct outside the scope of the traditional publisher's function would be required. Our review of the complaint reveals no such allegation, and we have no occasion in this case to explore the outer boundary of "good faith" in the good samaritan provision. We conclude that, as a matter of law, Moldow's conduct did not constitute bad faith within the meaning of § 230(c)(2)(A). See Printing *728 Mart, supra, 116 N.J. at 766-67, 563 A.2d 31.
Affirmed.
NOTES
[1] We address only the claims of appellants, Donato and Calogero, against Moldow. We do not address the claims made by two other plaintiffs, Eric Obernauer and Lawrence R. Campagna, who have not appealed. Nor do we address any aspects of Moldow's counterclaim against plaintiffs or his third-party complaint against Kenneth Hoffman, both of which resulted in dismissal and have not been appealed.
[2] The trial judge made a finding that New Jersey does not recognize a private cause of action for damages for the tort of "harassment," thus constituting an alternate basis for dismissing the harassment count against all defendants, including Moldow. It is not necessary for us to address this issue.