2 A.3d 428 (2010)
415 N.J. Super. 442
Tom JUZWIAK, Plaintiff-Respondent,
v.
John/Jane DOE, a.k.a. "Josh Hartnett," a.k.a. jharthat@yahoo.com, Defendant-Appellant.
No. A-2302-09T2.
Superior Court of New Jersey, Appellate Division.
Argued May 25, 2010.
Decided August 3, 2010.
*429 David T. Lewis argued the cause for appellant (Lewis & Forrey, attorneys; Mr. Lewis, on the briefs).
Edward A. Cridge argued the cause for respondent (Wills, O'Neill & Mellk, attorneys; Arnold M. Mellk, Princeton, of counsel; Mr. Cridge and Gidian R. Mellk, on the brief).
Before Judges WEFING, GRALL and LeWINN.
The opinion of the court was delivered by
WEFING, P.J.A.D.
Defendant John Doe appeals, pursuant to leave granted, from a trial court order denying his motion to quash a subpoena served upon his Internet service provider. After reviewing the record in *430 light of the contentions advanced on appeal, we reverse.
The record before us is sparse. It consists of plaintiff's complaint and the record created in connection with defendant's motion to quash. From that record, we glean the following factual background. Plaintiff was employed as a teacher by Hightstown High School. The record does not indicate how long he had served in that position, but he had achieved tenure. On July 23, 2009, he received an e-mail simply signed "Josh." It listed the sender as "`Josh Hartnett' >[.]". The subject line of the e-mail stated "Hopefully you will be gone permanently[.]" The body of the e-mail read, "We are all praying for that. Josh"
A second e-mail was sent on August 11, 2009. It also indicated it was sent by "`Josh Hartnett' 

A third e-mail was sent two days later, on August 13, 2009; it bore the same sending address; its subject line was "Mr. Juzwiak in the Hightstown/East Windsor School System." The text of this e-mail read:
It has been brought to my attention and I am sure many of you know that Mr. J is reapplying for his position as a teacher in this town. It has further been pointed out that certain people are soliciting supporters for him. This is tantamount to supporting the devil himself. I am not asking anyone to speak out against Mr. J but I urge you to then be silent as we can not continue to allow the children of this school system nor the parents to be subjected to his evil ways. Thank you. Josh
The context of this third e-mail makes clear that it was sent to individuals in the area served by the school district, but the record does not disclose the number of people to whom it was directed. The record before us is entirely silent as to the nature of the controversy surrounding plaintiff's position in the Hightstown school system and what led to these e-mails being sent.
A week later, on August 20, 2009, plaintiff filed a two-count complaint, seeking damages for intentional infliction of emotional distress and harassment. Because he did not know the identity of the author of these e-mails, plaintiff named the defendant as "John/Jane Doe" and served a subpoena on Yahoo! Inc. ("Yahoo!"), the Internet service provider listed on the e-mails, to provide him with the author's identity.[1] Yahoo! notified its subscriber that it had received the subpoena and the subscriber, proceeding as "John/Jane Doe" moved to quash that subpoena.
In opposition to defendant's motion to quash, plaintiff certified that the threatening e-mails "severely disrupted [his] life... [causing] deep anger and depression... [and] insomnia [that] impaired [his] ability to concentrate and function effectively." Plaintiff also certified that the emotional stress manifested itself physically, exacerbating his back problems and causing him to lose twenty pounds. Prior to the receipt of the e-mails, plaintiff had been taking Paxil, but after, his depression *431 worsened and he was referred to a psychiatrist and prescribed Abilify, an anti-depressant and Klonopin, an anti-anxiety medication. Additionally, plaintiff was prescribed two sleep aids, Ambien and Sonata. Despite the medications, plaintiff certified that he still suffered from "depression, anxiety, and insomnia." Plaintiff also stated that he had thoughts of hurting himself and the "entire episode has consumed [his] life for several months."
Defendant argued that plaintiff had not established a prima facie case for each element of his cause of action and thus the subpoena should be quashed. The trial court disagreed.
Defendant Doe then moved for reconsideration. After further argument, the trial court, although it noted it was a close question, denied reconsideration but granted defendant's motion for a stay. We subsequently granted defendant's motion for leave to appeal.
We note first the standard governing our review of this matter. The trial court's conclusion was one of law; our review is thus de novo; we owe no deference to the trial court's legal conclusion. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).
The right to speak anonymously is protected by the First Amendment and "derives from the principle that to ensure a vibrant marketplace of ideas, some speakers must be allowed to withhold their identities to protect themselves from harassment and persecution." Matthew Mazzotta, Note, Balancing Act: Finding Consensus on Standards for Unmasking Anonymous Internet Speakers, 51 B.C.L.Rev. 833, 833 (2010) (footnote omitted). But "[t]he right to speak anonymously is not absolute. Plaintiffs have the right to seek redress for legally cognizable speech and speakers cannot escape liability simply by publishing anonymously." Id. at 833-34 (footnote omitted).
The leading case in New Jersey on the issue of whether an Internet service provider can be compelled to reveal the identity of one of its subscribers to a party aggrieved by an anonymous Internet posting is Dendrite Int'l, Inc. v. John Doe, 342 N.J.Super. 134, 775 A.2d 756 (App.Div. 2001). The Internet service provider Yahoo! maintained bulletin boards on which subscribers could post messages about publicly traded companies. Id. at 143, 775 A.2d 756. Although messages could be, and generally were, posted anonymously under pseudonyms, Yahoo! maintained the real name, mailing addresses and e-mail addresses of all those who posted messages. Ibid. Yahoo! had the following policy with respect to keeping this information confidential.
As a general rule, Yahoo! will not disclose any of your personally identifiable information except when we have your permission or under special circumstances, such as when we believe in good faith that the law requires it or under the circumstances described below.
. . . .
Yahoo! may also disclose account information in special cases when we have reason to believe that disclosing this information is necessary to identify, contact or bring legal action against someone who may be violating Yahoo!'s Terms of Service or may be causing injury to ... anyone ... that could be harmed by such activities.
[Ibid.]
The record in this matter does not disclose whether Yahoo! has modified that policy in any manner in the interim.
One such bulletin board was devoted exclusively to the plaintiff Dendrite International, Inc. ("Dendrite"). From March *432 14, 2000, through June 2, 2000, John Doe No. 3 posted four messages on this bulletin board about Dendrite's accounting methods and its president that Dendrite alleged were false. Id. at 145, 775 A.2d 756. Dendrite filed suit against John Doe No. 3 and other fictitiously named defendants, alleging defamation and misappropriation of trade secrets. Id. at 146, 775 A.2d 756. Dendrite sought to conduct limited expedited discovery to learn the identity of the John Doe defendants, including John Doe No. 3. Ibid. The trial court denied Dendrite's application, and we granted leave to appeal. Id. at 147, 775 A.2d 756. We set forth the following guidelines for the consideration of applications to discover the identity of those posting anonymous messages on message boards maintained by Internet service providers. We noted that courts considering such an application "must ... strik[e] a balance between the well-established First Amendment right to speak anonymously, and the right of the plaintiff to protect its proprietary interests and reputation through the assertion of recognizable claims based on the actionable conduct of the anonymous, fictitiously-named defendants." Id. at 141, 775 A.2d 756. We outlined the steps to be taken in this process, the first of which, attempting to notify the anonymous poster, id. at 141, 775 A.2d 756, has been satisfied here. The second step, requiring that the plaintiff "set forth the exact statements," ibid., has also been met. At that juncture, the trial court must carefully review "[t]he complaint and all information provided ... to determine whether plaintiff has set forth a prima facie cause of action. ..." Id. at 141, 775 A.2d 756. It is not sufficient that a plaintiff could defeat a motion for failure to state a cause of action under Rule 4:6-2(e); when presented with such a motion, the court reviews the complaint with liberality and without reference to the plaintiff's ability to prove the allegations. Banco Popular N. Am. v. Gandi, 184 N.J. 161, 165, 183, 876 A.2d 253 (2005); Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989). Rather, the plaintiff "must produce sufficient evidence supporting each element of its cause of action, on a prima facie basis..." before a court may order disclosure of the poster's identity. Immunomedics, Inc. v. Doe, 342 N.J.Super. 160, 166, 775 A.2d 773 (App.Div.2001) (quoting Dendrite Int'l, Inc., supra, 342 N.J.Super. at 141, 775 A.2d 756). If a plaintiff satisfies those steps, the trial court at that juncture "must balance the defendant's First Amendment right of anonymous free speech against the strength of the prima facie case presented and the necessity for the disclosure of the anonymous defendant's identity to allow the plaintiff to properly proceed." Ibid. (quoting Dendrite Int'l, Inc., supra, 342 N.J.Super. at 142, 775 A.2d 756). The court intended that these guidelines would be "flexible, non-technical, [and] fact sensitive" and would be applied so "that plaintiffs do not use discovery procedures to ascertain the identities of unknown defendants in order to harass, intimidate or silence critics in the public forum opportunities presented by the Internet." Dendrite Int'l, Inc., supra, 342 N.J.Super. at 142, 775 A.2d 756
The trial court in its analysis of this matter attempted to apply the Dendrite standard. Defendant on appeal contends that it did so erroneously while plaintiff's initial contention is that Dendrite is inapplicable in the first instance. Plaintiff makes this assertion on the basis that the postings constitute threats against him and are not entitled to the protection of the First Amendment. He stresses the first message, with its statement, "Hopefully you will be gone permanently[.]" Plaintiff says that he viewed this message as a threat and that as such, it is not entitled to *433 the protection of the First Amendment; he notes that after receiving this e-mail, he went to the police. There is no indication in the record that the police pursued the matter.
We reject plaintiff's argument in this regard. Nothing within the first message, in our judgment, can realistically be understood to constitute a threat to plaintiff's safety or well-being. There is no statement which purports to threaten to visit harm upon plaintiff or to warn of impending danger. There is, moreover, within the e-mail no context within which to place this message; it could as easily refer to plaintiff relocating his residence to another town.
The test for whether a communication is a threat cannot be a subjective one, based on plaintiff's personal, idiosyncratic reaction. The test for whether a communication should lose the mantle of First Amendment protection must be an objective one, rather than one based upon the personal and individual reaction of the recipient of the communication.
We turn then to consideration of the Dendrite standards to this matter. As we previously noted, there is no dispute that the first two elements have been satisfied. The dispute turns on whether plaintiff has sufficiently stated a prima facie claim for intentional infliction of emotional distress. Plaintiff contended that he had, and the trial court concurred. Defendant disputes this conclusion; we agree with defendant and thus reverse.
The four required elements of a claim for intentional infliction of emotional distress are well-settled. The Supreme Court set them forth in Buckley v. Trenton Saving Fund Socy., 111 N.J. 355, 544 A.2d 857 (1988). First, the plaintiff must prove that the defendant acted either intentionally or recklessly; "[f]or an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress." Id. at 366, 544 A.2d 857. Liability may also attach to a reckless act "when the defendant acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow." Ibid.
The second element of a claim for intentional infliction of emotional distress is conduct by the defendant that is so "extreme and outrageous ... as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Ibid. (quotation omitted).
The third required element is proximate cause. Ibid. The defendant's intentional or reckless conduct must have been the proximate cause of the plaintiff's emotional distress. Ibid.
The final element of a claim for intentional infliction of emotional distress is distress that is "so severe that no reasonable man could be expected to endure it." Ibid. (quotation omitted).
In Buckley, the plaintiff sought damages for intentional infliction of emotional distress on the grounds that the defendant had wrongly refused to cash a check presented by his wife from whom he was separated. Id. at 359, 544 A.2d 857. This, the plaintiff contended, led his separated spouse to berate him and his family not to speak to him. Id. at 360, 544 A.2d 857. He described his resultant emotional distress in the following manner:
"I lost sleep. I was aggravated. I was embarrassed. I developed headaches, and I suffered nervous tension while this was going on. Mostly, I was embarrassed about my kids, we're talking ten year old kids, ten down, talking about their dad."
[Id. at 368, 544 A.2d 857.]
*434 This, the Court held, was insufficient as a matter of law to sustain a claim for intentional infliction of emotional distress. Id. at 369, 544 A.2d 857.
Subsequent cases have provided further explication on the required elements of this tort. We catalogued these cases in our recent opinion in Turner v. Wong, 363 N.J.Super. 186, 200-01, 832 A.2d 340 (App. Div.2003), and Turner provides additional guidance. The defendant in that case was of Asian descent and owned and operated a shop in Cape May Court House. Id. at 196, 832 A.2d 340. The plaintiff was an African-American woman who entered the shop to purchase a donut and a cup of coffee. Ibid. When she took a bite of the donut, she complained that it was stale and asked for a replacement. Ibid. The defendant insisted that it was freshly baked and demanded that the plaintiff pay first for that donut. Id. at 196-97, 832 A.2d 340. When the plaintiff refused, the defendant berated her with racial insults and demanded that she leave the store. Id. at 197, 832 A.2d 340. The plaintiff later filed suit for damages on a variety of theories, including intentional infliction of emotional distress. Id. at 198, 832 A.2d 340. She noted that she felt "embarrassed, shocked, mortified, hurt, angry and humiliated. ... She claimed that since the incident, her self-esteem had deteriorated and that she viewed herself differently." Ibid. We affirmed the trial court's dismissal of her claim for intentional infliction of emotional distress.
In the course of our opinion, we noted that
[s]evere emotional distress is a severe and disabling emotional or mental condition which may be generally recognized and diagnosed by trained professionals. The emotional distress must be sufficiently substantial to result in either physical illness or serious psychological sequelae. The standard is an objective one. The defendant's conduct must be sufficiently severe to cause genuine and substantial emotional distress or harm to average persons.
[Id. at 200, 832 A.2d 340 (quotations omitted).]
"It is not enough to establish that a party is acutely upset by reason of the incident." Aly v. Garcia, 333 N.J.Super. 195, 204, 754 A.2d 1232 (App.Div.2000), certif. denied, 167 N.J. 87, 769 A.2d 1050 (2001).
In our judgment, plaintiff failed to satisfy two of the elements of a prima facie case for intentional infliction of emotional distress, and thus the trial court should have granted defendant's motion to quash this subpoena. First, we question whether the comments posted by "Josh," while upsetting to plaintiff, may fairly be characterized as "extreme and outrageous" or "beyond all possible bounds of decency[.]" Buckley, supra, 111 N.J. at 366, 544 A.2d 857. They did not accuse of plaintiff of vile acts. Goldhaber v. Kohlenberg, 395 N.J.Super. 380, 383-84, 928 A.2d 948 (App. Div.2007). They did not accuse plaintiff of criminal acts. Donato v. Moldow, 374 N.J.Super. 475, 865 A.2d 711 (App.Div. 2005). They did not contain racial insults. Turner, supra, 363 N.J.Super. at 197, 832 A.2d 340. They did not contain obscene or profane language.
It is clear the author of the posts was angry with plaintiff. Expressions of anger, without more, are not extreme or outrageous, however. In the third post, for instance, sent to parents in the district, there was no attempt to mount a public campaign against plaintiff. If defendant, acting on a personal vendetta, had sought to organize a concerted movement to drive plaintiff from his job and maliciously to undermine any support he might have, a different question would be presented. *435 That is not the scenario which has been presented to us, however.
Further, plaintiff did not submit any expert support for his contention that these postings caused distress "so severe that no reasonable man could be expected to endure it." Buckley, supra, 111 N.J. at 366, 544 A.2d 857. While plaintiff recited what he perceived to be the effects of these postings upon him  weight loss, sleeplessness, anxiety and depression  he did not include any certification from the physician who, he alleged, prescribed medication for him. While we would agree with plaintiff that he was not required to submit at that early juncture a complete expert report, he should have submitted some objective documentation of his claims in order to establish a prima facie claim for intentional infliction of emotional distress and thus defeat defendant's motion to quash the subpoena. We think production of such documentation was particularly important in this matter since plaintiff noted in his opposing certification that he had been taking anti-depressant medication even before he saw these postings.
Additionally, we are compelled to comment upon one aspect of this matter which, according to the record, was not treated by the parties or the trial court. Dendrite, supra, dealt with an application to reveal the identity of an individual who signed his or her postings, "John Doe No. 3." The postings at issue here were not signed "John Doe" or in a manner which would clearly indicate the use of a pseudonym. One of the factors which must be considered in any application to compel disclosure of the identity of an Internet poster is the necessity for that disclosure. Dendrite, supra, 342 N.J.Super. at 142, 775 A.2d 756; Mazzotta, supra, 51 B.C.L.Rev. at 854, noting "if a plaintiff does not need the identifying information to proceed with his or her claim, if the information is available from another source ... a court should not allow its unmasking power to be used to potentially violate the First Amendment rights of anonymous speakers." (footnote omitted).
Here, plaintiff presented no information about his efforts to identify "Josh" such as examination of a local telephone book or voting records, examination of the names of individuals who had been active in affairs at Hightstown High School, or the names of students with whom plaintiff may have experienced difficulties in the past. While we may infer from the fact that defendant moved to quash this subpoena under the name "John/Jane Doe" that "Josh Hartnett" is not the true name of the poster, plaintiff's opposition to the motion to quash only referred to the alleged sequelae he experienced, and was silent with respect to his efforts to learn "Josh's" true identity.
Plaintiff included in his complaint a second count, seeking damages for "harassment." We have, on several occasions, questioned whether there is a civil cause of action for damages for harassment. Donato, supra, 374 N.J.Super. at 480 n. 2, 865 A.2d 711; Aly, supra, 333 N.J.Super. at 203, 754 A.2d 1232. As with those matters, we find it unnecessary here to posit a direct answer to the question.
In Aly, we noted the analytical distinction between a civil claim for harassment for which damages were sought and a civil claim for harassment for which injunctive relief was sought. Aly, supra, 333 N.J.Super. at 203, 754 A.2d 1232. We noted further that a claim for damages for harassment is "akin" to a claim for damages for intentional infliction of emotional distress. Ibid. In our judgment, it would run counter to the policies expressed by the Court in Buckley, supra, if we were to permit a claim for harassment to proceed in the face of a conclusion that plaintiff had *436 failed to establish the prima facie elements of a claim for intentional infliction of emotional distress. Thus plaintiff's application for a subpoena is no more successful under the second count of his complaint than it was under the first.
The order under review is reversed.
NOTES
[1] The subpoena in question is not part of the record before us.