Christianne CARAFANO, a/k/a Chase Masterson, Plaintiff–Appellant,

v.

METROSPLASH.COM, INC., a Delaware corporation; Lycos, Inc., a Delaware corporation; Matchmaker.com, Inc., a Texas corporation, Defendants–Appellees.

No. 02–55658.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 2, 2003.

Filed Aug. 13, 2003.

Stephen F. Rohde and Mechele M. Berencsi, Rohde & Victoroff, Los Angeles, California, for the appellant.

Timothy L. Alger, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, California, for the appellee.

Patrick J. Carome, Samir Jain, and C. Colin Rushing; Wilmer Cutler & Pickering, Washington, DC; for amici curiae America Online, Inc., eBay, Inc., the Internet Commerce Coalition, and the United States Internet Service Provider Association. Laura A. Heymann, America Online, Inc., Dulles, Virginia; Michael J. Richter and Tod Cohen, eBay, Inc., San Jose, California; James J. Halpert, Piper Rudnick, LLP, Washington, DC; and Stewart A. Baker, Steptoe & Johnson, Washington, DC, were also on the brief.

Deborah Pierce and Linda Ackerman, Privacyactivism, San Francisco, California, for amici curiae The American Federation of Television and Radio Artists (AFTRA), Gavin De Becker, Privacyactivism, Privacy Rights Clearinghouse, and the Screen Actors Guild (SAG).

Before THOMAS, PAEZ, Circuit Judges, and REED, District Judge.[*]

THOMAS, Circuit Judge.

This is a case involving a cruel and sadistic identity theft. In this appeal, we consider to what extent a computer match making service may be legally responsible for false content in a dating profile provided by someone posing as another person. Under the circumstances presented by this

---

[*] The Honorable Edward C. Reed, Jr., United States District Judge for the District of Nevada, sitting by designation.

case, we conclude that the service is statutorily immune pursuant to 47 U.S.C. § 230(c)(1).

## I

Matchmaker.com is a commercial Internet dating service. For a fee, members of Matchmaker post anonymous profiles and may then view profiles of other members in their area, contacting them via electronic mail sent through the Matchmaker server. A typical profile contains one or more pictures of the subject, descriptive information such as age, appearance and interests, and answers to a variety of questions designed to evoke the subject's personality and reason for joining the service.

Members are required to complete a detailed questionnaire containing both multiple-choice and essay questions. In the initial portion of the questionnaire, members select answers to more than fifty questions from menus providing between four and nineteen options. Some of the potential multiple choice answers are innocuous; some are sexually suggestive. In the subsequent essay section, participants answer up to eighteen additional questions, including "anything that the questionnaire didn't cover." Matchmaker policies prohibit members from posting last names, addresses, phone numbers or e-mail addresses within a profile. Matchmaker reviews photos for impropriety before posting them but does not review the profiles themselves, relying instead upon participants to adhere to the service guidelines.

On October 23, 1999, an unknown person using a computer in Berlin posted a "trial" personal profile of Christianne Carafano in the Los Angeles section of Matchmaker. (New members were permitted to post "trial" profiles for a few weeks without paying.) The posting was without the knowledge, consent or permission of Carafano. The profile was listed under the identifier "Chase529."

Carafano is a popular actress. Under the stage name of Chase Masterson, Carafano has appeared in numerous films and television shows, such as "Star Trek: Deep Space Nine," and "General Hospital." Pictures of the actress are widely available on the Internet, and the false Matchmaker profile "Chase529" contained several of these pictures. Along with fairly innocuous responses to questions about interests and appearance, the person posting the profile selected "Playboy/Playgirl" for "main source of current events" and "looking for a one-night stand" for "why did you call." In addition, the open-ended essay responses indicated that "Chase529" was looking for a "hard and dominant" man with "a strong sexual appetite" and that she "liked sort of be[]ing controlled by a man, in and out of bed." The profile text did not include a last name for "Chase" or indicate Carafano's real name, but it listed two of her movies (and, as mentioned, included pictures of the actress).

In response to a question about the "part of the LA area" in which she lived, the profile provided Carafano's home address. The profile included a contact e-mail address, cmla2000@yahoo.com, which, when contacted, produced an automatic e-mail reply stating, "You think you are the right one? Proof it !!" [sic], and providing Carafano's home address and telephone number.

Unaware of the improper posting, Carafano soon began to receive messages responding to the profile. Although she was traveling at the time, she checked her voicemail on October 31 and heard two sexually explicit messages. When she returned to her home on November 4, she found a highly threatening and sexually explicit fax that also threatened her son. Alarmed, she contacted the police the fol-

lowing day. As a result of the profile, she also received numerous phone calls, voicemail messages, written correspondence, and e-mail from fans through her professional e-mail account. Several men expressed concern that she had given out her address and phone number (but simultaneously expressed an interest in meeting her). Carafano felt unsafe in her home, and she and her son stayed in hotels or away from Los Angeles for several months.

Sometime around Saturday, November 6, Siouxzan Perry, who handled Carafano's professional website and much of her e-mail correspondence, first learned of the false profile through a message from "Jeff." Perry exchanged e-mails with Jeff, visited the Matchmaker site, and relayed information about the profile to Carafano. Acting on Carafano's instructions, Perry contacted Matchmaker and demanded that the profile be removed immediately. The Matchmaker employee indicated that she could not remove the profile immediately because Perry herself had not posted it, but the company blocked the profile from public view on Monday morning, November 8. At 4:00 AM the following morning, Matchmaker deleted the profile.

Carafano filed a complaint in California state court against Matchmaker and its corporate successors, alleging invasion of privacy, misappropriation of the right of publicity, defamation, and negligence. The defendants removed the case to federal district court. The district court granted the defendants' motion for summary judgment in a published opinion. *Carafano v. Metrosplash.com, Inc.*, 207 F.Supp2d 1055 (C.D.Cal.2002). The court rejected Matchmaker's argument for immunity under 47 U.S.C. § 230(c)(1) after finding that the company provided part of the profile content. *Id.* at 1067–68. However, the court rejected Carafano's invasion of privacy claim on the grounds that her home ad-

dress was "newsworthy" and that, in any case, Matchmaker had not disclosed her address with reckless disregard for her privacy. *Id.* at 1069. Similarly, the court rejected Carafano's claims for defamation, negligence, and misappropriation because she failed to show that Matchmaker had acted with actual malice. *Id.* at 1073–76.

Carafano timely appealed. America Online, eBay, and two coalitions of online businesses intervened to challenge the district court's construction of § 230(c)(1). Several privacy advocacy groups and two organizations representing entertainers intervened in support of Carafano.

## II

■ The dispositive question in this appeal is whether Carafano's claims are barred by 47 U.S.C. § 230(c)(1), which states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Through this provision, Congress granted most Internet services immunity from liability for publishing false or defamatory material so long as the information was provided by another party. As a result, Internet publishers are treated differently from corresponding publishers in print, television and radio. *See Batzel v. Smith*, 333 F.3d 1018, 1026–27 (9th Cir.2003).

Congress enacted this provision as part of the Communications Decency Act of 1996 for two basic policy reasons: to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material. *See id.* at 1026–30 (recounting the legislative history and purposes of this section). Congress incorporated these ideas into the text of § 230 itself, expressly noting that "interactive computer services have flourished,

to the benefit of all Americans, with a minimum of government regulation," and that "[i]ncreasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services." 47 U.S.C. § 230(a)(4), (5). Congress declared it the "policy of the United States" to "promote the continued development of the Internet and other interactive computer services," "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services," and to "remove disincentives for the development and utilization of blocking and filtering technologies." 47 U.S.C. § 230(b)(1), (2), (4).

In light of these concerns, reviewing courts have treated § 230(c) immunity as quite robust, adopting a relatively expansive definition of "interactive computer service"[1] and a relatively restrictive definition of "information content provider."[2] Under the statutory scheme, an "interactive computer service" qualifies for immunity so long as it does not also function as an "information content provider" for the portion of the statement or publication at issue.

We recently considered whether § 230(c) provided immunity to the operator of an electronic newsletter who selected and published an allegedly defamatory e-mail over the Internet. *Batzel,* 333 F.3d at 1030–32. We held that the online newsletter qualified as an "interactive computer service" under the statutory definition and that the selection for publication and editing of an e-mail did not constitute partial "creation or development" of that information within the definition of "information content provider." Although the case was ultimately remanded for determination of whether the original author intended to "provide" his e-mail for publication, *id.* at 1035, the *Batzel* decision joined the consensus developing across other courts of appeals that § 230(c) provides broad immunity for publishing content provided primarily by third parties. *See Green v. America Online,* 318 F.3d 465, 470–71 (3d Cir.2003) (upholding immunity for the transmission of defamatory messages and a program designed to disrupt the recipient's computer); *Ben Ezra, Weinstein, & Co. v. America Online Inc.,* 206 F.3d 980, 985–86 (10th Cir.2000) (upholding immunity for the on-line provision of stock information even though AOL communicated frequently with the stock quote providers and had occasionally deleted stock symbols and other information from its database in an effort to correct errors); *Zeran v. America Online,* 129 F.3d 327, 328–29 (4th Cir.1997) (upholding immunity for both initial publication and delay in removal of false messages connecting offensive tee-shirts to the plaintiff's name and home telephone number). As the Fourth Circuit has noted:

> Congress made a policy choice ... not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages. Congress' purpose in providing the § 230 immunity was thus evident. Interactive computer ser-

---

1. "The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

2. "The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

vices have millions of users. The amount of information communicated via interactive computer services is therefore staggering. The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

*Zeran,* 129 F.3d at 330–31 (citation omitted); *see also Batzel,* 333 F.3d at 1027 (quoting *Zeran* with approval). Under § 230(c), therefore, so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process.

The fact that some of the content was formulated in response to Matchmaker's questionnaire does not alter this conclusion. Doubtless, the questionnaire facilitated the expression of information by individual users. However, the selection of the content was left exclusively to the user. The actual profile "information" consisted of the particular options chosen and the additional essay answers provided. Matchmaker was not responsible, even in part, for associating certain multiple choice responses with a set of physical characteristics, a group of essay answers, and a photograph. Matchmaker cannot be considered an "information content provider" under the statute because no profile has any content until a user actively creates it.

As such, Matchmaker's role is similar to that of the customer rating system at issue in *Gentry v. eBay, Inc.,* 99 Cal. App.4th 816, 121 Cal.Rptr.2d 703 (2002). In that case, the plaintiffs alleged that eBay "was an information content provider in that it was responsible for the creation of information, or development of information, for the online auction it provided through the Internet." *Id.* at 717. Specifically, the plaintiffs noted that eBay created a highly structured Feedback Forum, which categorized each response as a "Positive Feedback," a "Negative Feedback," or a "Neutral Feedback." *Id.* In addition, eBay provided a color coded star symbol next to the user name of a seller who had achieved certain levels of "Positive Feedback" and offered a separate "Power Sellers" endorsement based on sales volume and Positive Feedback ratings. *Id.* The court concluded that § 230 barred the claims:

> Appellants' negligence claim is based on the assertion that the information is false or misleading because it has been manipulated by the individual defendants or other co-conspiring parties. Based on these allegations, enforcing appellants' negligence claim would place liability on eBay for simply compiling false and/or misleading content created by the individual defendants and other coconspirators. We do not see such activities transforming eBay into an information content provider with respect to the representations targeted by appellants as it did not create or develop the underlying misinformation.

*Id.* at 717–18. Similarly, the fact that Matchmaker classifies user characteristics into discrete categories and collects responses to specific essay questions does not transform Matchmaker into a "developer" of the "underlying misinformation."

We also note that, as with eBay, Matchmaker's decision to structure the informa-

tion provided by users allows the company to offer additional features, such as "matching" profiles with similar characteristics or highly structured searches based on combinations of multiple choice questions. Without standardized, easily encoded answers, Matchmaker might not be able to offer these services and certainly not to the same degree. Arguably, this promotes the expressed Congressional policy "to promote the continued development of the Internet and other interactive computer services." 47 U.S.C. § 230(b)(1).

Carafano responds that Matchmaker contributes much more structure and content than eBay by asking 62 detailed questions and providing a menu of "pre-prepared responses." However, this is a distinction of degree rather than of kind, and Matchmaker still lacks responsibility for the "underlying misinformation."

■ Further, even assuming Matchmaker could be considered an information content provider, the statute precludes treatment as a publisher or speaker for "*any* information provided by *another* information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). The statute would still bar Carafano's claims unless Matchmaker created or developed the particular information at issue. As the *Gentry* court noted,

> [T]he fact appellants allege eBay is an information content provider is irrelevant if eBay did not itself create or develop the content for which appellants seek to hold it liable. It is not inconsistent for eBay to be an interactive service provider and also an information content

provider; the categories are not mutually exclusive. The critical issue is whether eBay acted as an information content provider with respect to the information that appellants claim is false or misleading.

121 Cal.Rptr.2d at 717 n. 11.

In this case, critical information about Carafano's home address, movie credits, and the e-mail address that revealed her phone number were transmitted unaltered to profile viewers. Similarly, the profile directly reproduced the most sexually suggestive comments in the essay section, none of which bore more than a tenuous relationship to the actual questions asked. Thus Matchmaker did not play a significant role in creating, developing or "transforming" the relevant information.

Thus, despite the serious and utterly deplorable consequences that occurred in this case, we conclude that Congress intended that service providers such as Matchmaker be afforded immunity from suit. Thus, we affirm the judgment of the district court, albeit on other grounds.[3]

**AFFIRMED.**

---

3. The resolution of this case makes it unnecessary for us to address the district court's rationale, and nothing in this opinion should be construed as approving or disapproving of it. For the same reason, we need not—and do not—reach any other issue raised by the parties.