**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FAIR HOUSING COUNCIL OF SAN
FERNANDO VALLEY; THE FAIR
HOUSING COUNCIL OF SAN DIEGO,
individually and on behalf of the
GENERAL PUBLIC,
               *Plaintiffs-Appellants,*

v.

ROOMMATES.COM, LLC,
               *Defendant-Appellee.*

No. 04-56916

D.C. No.
CV-03-09386-PA

FAIR HOUSING COUNCIL OF SAN
FERNANDO VALLEY; THE FAIR
HOUSING COUNCIL OF SAN DIEGO,
individually and on behalf of the
GENERAL PUBLIC,
               *Plaintiffs-Appellees,*

v.

ROOMMATE.COM, LLC,
               *Defendant-Appellant.*

No. 04-57173

D.C. No.
CV-03-09386-PA

OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
December 5, 2006—Pasadena, California

Filed May 15, 2007

Before: Stephen Reinhardt, Alex Kozinski and
Sandra S. Ikuta, Circuit Judges.

5709

Opinion by Judge Kozinski;
Partial Concurrence and Partial Dissent by Judge Reinhardt;
Concurrence by Judge Ikuta

## COUNSEL

Gary Rhoades, Rhoades & Al-Mansour, Los Angeles, California; Michael Evans, Costa Mesa, California; and Christopher Brancart, Brancart & Brancart, Pescadero, California, for the plaintiffs-appellants.

Timothy L. Alger, Lesley E. Williams and Steven B. Stiglitz, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, California, for the defendant-appellee.

Patrick J. Carome, Samir Jain and C. Colin Rushing, Wilmer Cutler Pickering Hale & Dorr, LLP, Washington, D.C., as amici curiae in support of the defendant-appellee.

---

## OPINION

KOZINSKI, Circuit Judge:

We consider the scope of immunity accorded to an online roommate matching service by the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c).

### Facts

The Internet has opened new channels of communication and self-expression. *See* Lev Grossman, *Time's Person of the Year: You*, Time Mag., Dec. 13, 2006-Jan. 1, 2007, at 38, 40-41. Countless individuals use message boards, date matching sites, interactive social networks, blog hosting services and video sharing websites to make themselves and their ideas visible to the world.[1] While such intermediaries enable the user-driven digital age, they also create new legal problems.

---

[1] Confirming perhaps Andy Warhol's prediction that everyone would eventually enjoy a trillion or so nanoseconds of fame.

This case involves one such intermediary, Roommate.com, LLC ("Roommate"), which operates an online roommate matching website at www.roommates.com. This website helps individuals find roommates based on their descriptions of themselves and their roommate preferences. Roommates.com has approximately 150,000 active listings and receives about a million page views per day.

To become members of Roommate, users respond to a series of online questionnaires by choosing from answers in drop-down and select-a-box menus. Users must disclose information about themselves and their roommate preferences based on such characteristics as age, sex and whether children will live in the household. They can then provide "Additional Comments" through an open-ended essay prompt.

Roommate's free membership allows users to create personal profiles, search lists of compatible roommates and send "roommail" messages to other members. Roommate also sends email newsletters to members seeking housing, listing compatible members who have places to rent out. Roommate's fee-based membership allows users to read their "roommail" and view the "Additional Comments" essays of other members.

The Fair Housing Councils of San Fernando Valley and San Diego ("the Councils") filed suit in federal district court, claiming that Roommate violated the Fair Housing Act ("FHA") and various state laws. The district court held that the Communications Decency Act barred the Councils' FHA claim. As a result, the court granted, in part, Roommate's summary judgment motion and entered judgment in Roommate's favor on the FHA claim. The district court then declined to exercise supplemental jurisdiction over the state-law claims and dismissed them. It also denied Roommate's motion for attorneys' fees and costs. The Councils now appeal the dismissal of their FHA claim and Roommate cross-appeals the denial of fees and costs.

## Analysis

**[1]** According to the CDA, "[n]o provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c). One of Congress's goals in adopting this provision was to encourage "the unfettered and unregulated development of free speech on the Internet." *Batzel* v. *Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003) (citing 47 U.S.C. § 230(a)(3)-(4), (b)(1)-(2)).[2]

**[2]** The touchstone of section 230(c) is that providers of interactive computer services are immune from liability for content created by third parties.[3] The immunity applies to a defendant who is the "provider . . . of an interactive computer service" and is being sued "as the publisher or speaker of any information provided by" someone else. 47 U.S.C. § 230(c). "[R]eviewing courts have treated § 230(c) immunity as quite robust." *Carafano* v. *Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003).

**[3]** The Councils do not dispute that Roommate is a provider of an interactive computer service.[4] As such, Roommate is immune so long as it merely publishes information pro-

---

[2]Congress also wanted to allow interactive computer services to regulate their own content without subjecting themselves to liability. *Batzel*, 333 F.3d at 1028 (citing 47 U.S.C. § 230(b)(4)); *see also* n.5 *infra*.

[3]The CDA also provides immunity in such circumstances for users of interactive services, but because our case does not involve a claim against users, we have no occasion to consider the scope of this immunity. We therefore omit all references to user immunity when quoting the statutory text.

[4]The CDA defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2); *see also Carafano* v. *Metrosplash.com, Inc.*, 207 F. Supp. 2d 1055, 1065-66 (C.D. Cal. 2002) (date matching website is an "interactive computer service"), *aff'd*, 339 F.3d 1119 (9th Cir. 2003).

vided by its members. *Batzel*, 333 F.3d at 1031. However, Roommate is not immune for publishing materials as to which it is an "information content provider." A content provider is "any person or entity that is responsible, *in whole or in part*, for the creation or development of information provided through the Internet." 47 U.S.C. § 230(f)(3) (emphasis added). In other words, if Roommate passively publishes information provided by others, the CDA protects it from liability that would otherwise attach under state or federal law as a result of such publication.[5] But if it is responsible, in whole or in part, for creating or developing the information, it becomes a content provider and is not entitled to CDA immunity. As we explained in *Carafano*, "an 'interactive computer service' qualifies for immunity so long as it does not also function as an 'information content provider' for the portion of the statement or publication at issue." 339 F.3d at 1123.

The Councils claim Roommate violates the FHA in three ways: (1) it posts the questionnaires on its website and requires individuals who want to take advantage of its services to complete them; (2) it posts and distributes by email its members' profiles; and (3) it posts the information its members provide on the "Additional Comments" form. For all three categories, the question is whether Roommate is "responsible, in whole or in part, for the creation or development of [the] information." 47 U.S.C. § 230(c), (f)(3); *see also Batzel*, 333 F.3d at 1031.

**1.** As previously explained, in order to become members of Roommate and take advantage of the services it offers, indi-

---

[5]As we discuss below, a provider of an interactive computer service does not lose its CDA immunity if it merely exercises some control over the posting of information provided by others, such as enforcement of rules as to appropriate content or minor editing. *See* n.6 *infra*. Nor does it generally lose its immunity if it simply facilitates expression of information by individuals. *See* pp. 5719-22 *infra*.

viduals must complete a series of questionnaires. Individuals looking for a room must first complete a form about themselves. They must use a drop-down menu to identify themselves as either "Male" or "Female" and to disclose whether "Children will be present" or "Children will not be present." Individuals looking to rent out a room must complete a similar form. They must use a check-box menu to indicate whether "Straight male(s)," "Gay male(s)," "Straight female-(s)," and/or "Lesbian(s)" now live in the household, and a drop-down menu to disclose if there are "Children present" or "Children not present." If users fail to provide answers to any of these questions, they cannot complete the membership registration process.

In addition to completing one of the two forms described above, all prospective members must fill out the "My Roommate Preferences" form. They must use a drop-down menu to indicate whether they are willing to live with "Straight or gay" males, only "Straight" males, only "Gay" males, or "No males," or may choose to select a blank response. Users must make comparable selections for females. They must also declare "I will live with children," "I will not live with children" or change the field to a blank.[6]

---

[6]When users select the option "I will not live with children," Roommate publishes this response as "no children please." The Councils argue that this alteration makes Roommate a content provider and therefore not immune under the CDA for publishing this statement. However, minor editing that does not affect meaning is protected under the CDA as the "usual prerogative of publishers." *See Batzel*, 333 F.3d at 1031 (publisher of a newsletter protected under the CDA for making minor editing changes to user-submitted content). Because "no children please" is materially the same as "I will not live with children," Roommate does not lose its CDA immunity because of the change in wording. On the other hand, the Councils allege that Roommate takes members' blank selection in the children field and publishes it as "no children please." We could not find support for this proposition in the record, but if Councils' allegation is true, then Roommate significantly alters the meaning of the information provided by its members and is not entitled to CDA immunity for posting the resulting content.

**[4]** As we previously explained, an entity cannot qualify for CDA immunity when it is "responsible, in whole or in part, for the creation or development of [the] information" at issue. 47 U.S.C. § 230(c), (f)(3); *see also Batzel*, 333 F.3d at 1031. Roommate is "responsible" for these questionnaires because it "creat[ed] or develop[ed]" the forms and answer choices. As a result, Roommate is a content provider of these questionnaires and does not qualify for CDA immunity for their publication.

Roommate objects that simply asking questions cannot violate the FHA. Yet the Councils advance two theories under which publication of these forms arguably does violate the FHA. First, the Councils argue that asking users to provide information about themselves and their roommate preferences is a "statement . . . with respect to the sale or rental of a dwelling that *indicates . . . an intention* to make [a] preference, limitation or discrimination." *See* 42 U.S.C. § 3604(c) (emphasis added); *see, e.g.*, *Jancik* v. *Dep't of Hous. & Urban Dev.*, 44 F.3d 553, 557 (7th Cir. 1995); *Soules* v. *Dep't of Hous. & Urban Dev.*, 967 F.2d 817, 824 (2d Cir. 1992).[7] Second, the Councils claim that requiring members to answer questions that enable other members to discriminate for or against them violates the FHA by "*caus[ing]*" users "to [make] . . . any . . . *statement* . . . with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination." 42 U.S.C. § 3604(c) (emphasis added).

**[5]** At this stage, we are only concerned with whether Roommate is immune from liability under the CDA, not

---

[7]Although Amici Amazon.com, Inc., America Online, Inc., Ebay Inc., Google Inc., Tribune Company, Yahoo! Inc., Netchoice and United States Internet Service Provider Association support Roommate in this appeal, they acknowledge that "if there were a circumstance in which the content of questions posed by an online intermediary—in isolation, and entirely independent of any user's answers or any third-party's use of the questions or users' answers—was itself unlawful, then section 230 might not protect the intermediary from a cause of action based solely on the questions."

whether it actually violated the FHA. We describe the Councils' FHA theories only to show that the mere asking of questions might, indeed, violate the FHA. It will be up to the district court on remand to decide initially whether Roommate violated the FHA by publishing its form questionnaires.[8]

**2.** We now turn to the more difficult question of whether the CDA exempts Roommate from liability for publishing and distributing its members' profiles, which it generates from their answers to the form questionnaires.

Roommate strongly urges that *Carafano* settles the issue. In *Carafano*, an unidentified prankster placed a fraudulent personal ad on a date matching website. 339 F.3d at 1121. This imposter created a profile for Carafano, an actress, listing her real phone number and address. The ad claimed that Carafano was looking for "a one-night stand" with a controlling man. *Id.* We held that the CDA exempted the service from liability for two reasons.

[6] First, the dating service was not an "information content provider" for the profiles on its website. Although the website required users to complete detailed questionnaires consisting of both multiple choice and essay questions that provided "structure and content" and a "menu of 'pre-prepared responses,' " these forms merely "facilitated the expression of information by individual users." *Id.* at 1124-25 (internal quo-

---

[8]Roommate also argues that we should not consider the Councils' FHA liability theories based on the questionnaires because these arguments were not properly raised below. However, we are reviewing only the district court's grant of summary judgment on CDA grounds and remanding the FHA claim for resolution by the district court. In any event, the Councils, in their First Amended Complaint, cited to the FHA, 42 U.S.C. § 3604(c), and alleged that Roommate "encourages" users to state discriminatory preferences. This is more than enough under our liberal notice pleading rule. *See Johnson* v. *Barker*, 799 F.2d 1396, 1401 (9th Cir. 1986) ("Under federal notice pleading, appellants are allowed to vary their theory to conform to proof presented.").

tation marks omitted). We concluded that the service could not "be considered an 'information content provider' under the [CDA] because no profile ha[d] any content until a user actively create[d] it." *Id.* at 1124. Second, even if the dating service could be considered a content provider for publishing its customers' profiles, it was exempt from liability because it did not "create[ ] or develop[ ] the particular information at issue." *Id.* at 1125. The anonymous user entered Carafano's phone number, address and fabricated sexual proclivities, and his entries were "transmitted unaltered to profile viewers." *Id.* The service was not a content provider of the offending information because it "did not play a significant role in creating, developing or 'transforming' " it. *Id.*

*Carafano* differs from our case in at least one significant respect: The prankster in *Carafano* provided information that was not solicited by the operator of the website. The website sought information about the individual posting the information, not about unwitting third parties. Nothing in the questions the dating service asked suggested, encouraged or solicited posting the profile of another person, and the website's policies prohibited altogether the posting of last names and contact information. *Id.* at 1121. While *Carafano* is written in broad terms, it must be read in light of its facts. *Carafano* provided CDA immunity for information posted by a third party that was not, in any sense, created or developed by the website operator—indeed, that was provided *despite* the website's rules and policies. *Id.* We are not convinced that *Carafano* would control in a situation where defamatory, private or otherwise tortious or unlawful information was provided by users in direct response to questions and prompts from the operator of the website.

Imagine, for example, www.harrassthem.com with the slogan "Don't Get Mad, Get Even." A visitor to this website would be encouraged to provide private, sensitive and/or defamatory information about others—all to be posted online for a fee. To post the information, the individual would be

invited to answer questions about the target's name, addresses, phone numbers, social security number, credit cards, bank accounts, mother's maiden name, sexual orientation, drinking habits and the like. In addition, the website would encourage the poster to provide dirt on the victim, with instructions that the information need not be confirmed, but could be based on rumor, conjecture or fabrication.

It is not clear to us that the operator of this hypothetical website would be protected by the logic of *Carafano*. The date match website in *Carafano* had no involvement in the creation and development of the defamatory and private information; the hypothetical operator of harrassthem.com would. By providing a forum designed to publish sensitive and defamatory information, and suggesting the type of information that might be disclosed to best harass and endanger the targets, this website operator might well be held responsible for creating and developing the tortious information. *Carafano* did not consider whether the CDA protected such websites, and we do not read that opinion as granting CDA immunity to those who actively encourage, solicit and profit from the tortious and unlawful communications of others.

**[7]** While mapping the outer limits of *Carafano*'s protection of websites that solicit and post users' responses is an interesting and difficult task, we need not undertake it today because Roommate does more than merely publish information it solicits from its members. Roommate also channels the information based on members' answers to various questions, as well as the answers of other members. Thus, Roommate allows members to search only the profiles of members with compatible preferences. For example, a female room-seeker who is living with a child can only search profiles of room-providers who have indicated they are willing to live with women and children. Roommate also sends room-seekers email notifications that exclude listings incompatible with their profiles. Thus, Roommate will not notify our female

about room-providers who say they will not live with women or children.

**[8]** While Roommate provides a useful service, its search mechanism and email notifications mean that it is neither a passive pass-through of information provided by others nor merely a facilitator of expression by individuals. By categorizing, channeling and limiting the distribution of users' profiles, Roommate provides an additional layer of information that it is "responsible" at least "in part" for creating or developing. 47 U.S.C. § 230(c), (f)(3); *see also Batzel*, 333 F.3d at 1031. Whether these actions ultimately violate the FHA is a question the district court must decide in the first instance.[9]

**3.**   Finally, we consider whether the CDA exempts Roommate from liability for publishing the content its members provide in the "Additional Comments" portion of their profiles. Members provide this information by filling in a blank text box. Next to this box, Roommate advises users that "[w]e strongly recommend taking a moment to personalize your profile by writing a paragraph or two describing yourself and what you are looking for in a roommate." The responses to this query produce the most provocative and revealing information in many users' profiles. Some state that they "Pref[er] white Male roommates," while others declare that they are "NOT looking for black muslims." Some don't want to deal with annoyances such as "drugs, kids or animals" or "smokers, kids or druggies," while others want to stay away from "psychos or anyone on mental medication." More friendly

---

[9]Roommate does not ask questions about race, nor does it categorize or channel the information based on racial preferences. Yet, the logic of its position—that it is protected by the CDA for its activities because they are based on answers from its members—would protect it (or one of its competitors), if it did. Thus, if a hypothetical website required members to identify themselves by race, under Roommate's logic, the CDA would protect this site if it prevented members who listed themselves as "African-American" or "Asian" from viewing any "Whites Only" listings. We doubt this is what Congress had in mind when it passed the CDA.

folks are just looking for someone who will get along with their significant other[10] or their most significant Other.[11]

[9] We conclude that Roommate's involvement is insufficient to make it a content provider of these comments. Roommate's open-ended question suggests no particular information that is to be provided by members; Roommate certainly does not prompt, encourage or solicit any of the inflammatory information provided by some of its members. Nor does Roommate use the information in the "Additional Comments" section to limit or channel access to listings. Roommate is therefore not "responsible, in whole or in part, for the creation or development of" its users' answers to the open-ended "Additional Comments" form, and is immune from liability for publishing these responses. 47 U.S.C. § 230(c), (f)(3); *see also Batzel*, 333 F.3d at 1031.

\* \* \*

Having determined that the CDA does not immunize Roommate for all of the content on its website and in its email newsletters, we remand for a determination of whether its non-immune publication and distribution of information violates the FHA, 42 U.S.C. § 3604(c). We also vacate the dismissal of the state law claims so that the district court may reconsider whether to exercise its supplemental jurisdiction in light of our ruling on the federal claims. *Fredenburg* v. *Contra Costa County Dep't of Health Servs.*, 172 F.3d 1176, 1183 (9th Cir. 1999). We deny Roommate's cross-appeal for attorneys' fees and costs; as the Councils prevail on some of their arguments here, their case is perforce not frivolous.

---

[10]"The female we are looking for hopefully wont [sic] mind having a little sexual incounter [sic] with my boyfriend and I [very sic]."

[11]"We are 3 Christian females who Love our Lord Jesus Christ . . . . We have weekly bible studies and bi-weekly times of fellowship."

**REVERSED in part and REMANDED**.

REINHARDT, Circuit Judge, concurring in part and dissenting in part:

I join Judge Kozinski's opinion for the court, except for its holding that the Communications Decency Act (the "Act"), 47 U.S.C. § 230(c), immunizes Roommate from liability with respect to the statements contained in the "Additional Comments" section of users' profiles, some of which expressly state the preferences of landlords for tenants based on race,[1] religion,[2] gender,[3] sexual orientation,[4] and national origin.[5] I would hold instead that *none* of the information that the Fair Housing Councils of San Fernando Valley and San Diego ("Councils") challenge satisfies the test for § 230(c) immunity.

Roommate cannot receive § 230(c) immunity for publishing information in the "Additional Comments," if it is "responsible . . . in part, for the . . . creation or development of

---

[1]A member with the profile name "BLKMAIL4U" states that "The person applying for the room MUST be a *BLACK* GAY MALE." (emphasis added).

[2]A member with the profile name "sassy1lady" states that "This is a Christian home and we are looking for a *Christian* female to rent a downstairs room." (emphasis added).

[3]A member with the profile name "mrtoy2001" states that "I am looking for sex starved *women* who are wanting to get that funny familiar forgotten feeling all over again. The better I can make you feel, the better I feel. I don't know about you but I am ready to feel real good. My goal is to PLEASE YOU." (emphasis added).

[4]A member with the profile name "happyheart" states that "I am looking for a neat freak, christian, non smoking, *straight*, friendly female to share an apartment with. I am all of the above." (emphasis added).

[5]A member with the profile name "bala" states that "I am looking for *asian/spanish* persons to share the apartment." (emphasis added).

information." § 230(c), (f)(3); *see also Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003). The court's opinion here sets forth two independent tests to determine whether Roommate, an interactive computer service, is responsible in part for creating or developing information under § 230(c): first, whether Roommate categorizes, channels and limits the distribution of information, thereby creating another layer of information, Op. at 5721-22, 5723; and second, whether Roommate actively prompts, encourages, or solicits the unlawful information. *Id.* at 5720, 5723. Meeting either test results in a computer service's inability to obtain § 230(c) immunity. Unlike Judge Kozinski, I would hold that Roommate's conduct with respect to statements in the "Additional Comments" satisfies both tests, and, thus, that Roommate is not immune for publishing that information.

## I.   Because Roommate Categorizes, Channels, and Limits Complete User Profiles, Which Include the Statements in the "Additional Comments," Roommate is Responsible for Creating or Developing the Information

The court's opinion draws a distinction between (1) the statements in the "Household" and "Preferences" portions of users' profiles, which consist of users' responses to specific questions about their identities and preferences for tenants on the basis of gender, familial status, and sexual orientation, and (2) the statements in the "Additional Comments" portion of the profiles, which consist of users' free-form responses, and which in many instances contain preferences based on race, religion, and national origin, and in others expand upon the answers with respect to the preferences listed in the preceding portion of the profiles. It holds that Roommate is not immune for statements in the earlier portions but it is for statements in the "Additional Comments" portion. Op. at 5722-23.

While I agree with Judge Kozinski's reasons for rejecting immunity for statements in the "Household" and "Preferences" portions — that "[b]y categorizing, channeling and

limiting the distribution of users' profiles, Roommate provides an additional layer of information that it is 'responsible' at least 'in part' for creating or developing," Op. at 5722 (citations omitted), — I would hold that this principle applies to statements in the "Additional Comments" portion as well. I would do so because the "Additional Comments" portion is an integral part of the *entire* "users' profiles," which Roommate categoriz[es], channel[s] and limit[s] [in] distribution." *Id.*

Roommate does not display the different portions of a user's profile in distinct e-mails or web pages, but instead aggregates an entire profile and presents it as a whole. Thus, when Roommate "provides an additional layer of information" by channeling the completed "user profiles," *id.*, that additional layer of information includes the "Additional Comments" section with the various responses. Accordingly, Roommate should not be afforded immunity for *any* of the statements contained in the profile. In other words, the information that we should examine for the purpose of § 230(c) immunity should be the entire profile presented in the single e-mail or web page, including all of the statements therein. There is no justification for slicing and dicing into separate parts the material that Roommate elicits and then channels as an integral part of one package of information to the particular customers to whom it selectively distributes that package.

This view is supported by *Batzel*, in which we stated that to "meet[ ] the definition of 'information content provider' [in § 230(f)(3)] with respect to the *information in question*," the "pertinent question" is whether the interactive computer service "can also be considered to have 'creat[ed]' or 'develop[ed]' [the] *e-mail message* forwarded to the listserv." 333 F.3d at 1031 (emphasis added). Critically, we considered the "information in question" to be the entire "e-mail message," and not merely selected sentences in the e-mail which the plaintiff had identified as defamatory. Similarly, here, the "information in question" is the entire e-mail or web page,

*i.e.*, the complete profile. By channeling, categorizing and limiting distribution of the complete profile to the particular members who qualify to receive it, Roommate is responsible in part for creating and developing the *entire* profile.

Because I conclude that the first test for determining whether Roommate is responsible in part for creating or developing the information is satisfied with respect to the entire user profile, including the statements in the "Additional Comments," I would hold that Roommate cannot receive § 230(c) immunity for those statements.[6]

## II. Because Roommate Encourages, Solicits and Prompts its Users to Make Discriminatory Statements in the "Additional Comments" it is Responsible for Creating or Developing Those Statements

I would also hold that under the court's second test Roommate similarly lacks § 230(c) immunity for the statements contained in the "Additional Comments." Contrary to the conclusion in Judge Kozinski's opinion that Roommate "does not prompt, encourage or solicit any of the inflammatory information provided by some of its members" in the "Additional Comments" portion of their profiles, the record amply demonstrates that it does. Op. at 5723.

On the final page of the sign-up process in which prospective users create their profiles, Roommate's site states, "We strongly recommend taking a moment to personalize your

---

[6]I disagree with the court's conclusion that "Roommate's involvement is insufficient to make it a content provider" of the information in the "Additional Comments" portion of the profiles because Roommate does not "use the information in the 'Additional Comments' section to limit or channel access to listings." Op. at 5723. If Roommate is responsible even in part for creating or developing the entire profile, as Judge Kozinski's opinion makes clear, it is irrelevant that Roommate uses only the statements in the "Preferences" and "Household" portions to guide its categorization decisions.

profile by writing a paragraph or two describing yourself and what you are looking for in a roommate" directly above a blank box. This page immediately follows the "My Roommate Preferences" form, which explicitly asks members to provide their preferences based on gender, sexual orientation and familial status. Judge Kozinski concludes that the "open-ended" recommendation on the "Additional Comments" page "suggests no particular information that is to be provided by members." Op. at 5722. However, when viewed in the context of the entire sign-up process that conveys the message to prospective users that they should express their preferences for tenants based on race, gender, sexual orientation, national origin and religion, ordinary users would understand the recommendation to constitute a suggestion to expand upon the discriminatory preferences that they have already listed and to list their additional discriminatory preferences in that portion of the profile.

This conclusion finds both subjective and objective support in the record. From a subjective perspective, Roommate's site is designed so that users will express illicit preferences in their "Additional Comments." The executive who created the site acknowledges that he intended that users would express preferences in their profiles that can *only* be mentioned in the "Additional Comments" portion, such as religion. *See* Declaration of Bryan Peters ("Some Roommate.com users have religious beliefs that impact their selection of roommates. Many are Christians . . . . By referencing these beliefs in their profiles, users avoid the need to contact and interview dozens of incompatible people.").

Turning to the objective evidence of Roommate's solicitation, the best evidence of how users perceive the web site generally and the "Additional Comments" section specifically, is the myriad discriminatory statements that users have written in that section. The statements in notes 1 through 5, such as "The person applying for the room MUST be a BLACK GAY MALE," and the others relating to religious, racial, and gen-

der preferences, are representative of the numerous "Additional Comments" expressing such preferences. Additionally, the web site displays testimonials that suggest to potential users that they are free to obtain "suitable" tenants by listing discriminatory preferences — preferences that can only be set forth in the "Additional Comments." The site also invites prospective users to preview its search mechanism, thereby exposing them to user profiles that prominently display "nicknames" such as Christianldy, Chinesegirl, Whiteboy73, africanboy, Latinagirl, gaycouple, blackbarbie. By having its search mechanism display these nicknames to prospective users, Roommate suggests that it is desirable, as well as permissible, to use the profiles to achieve discriminatory goals. The site even displays a sample of a completed profile — linked from the front page — that includes a discriminatory preference in the first sentence of the "Additional Comments" section, illustrating how users may express similar preferences in their own profiles. Finally, by placing the "Additional Comments" form directly after the forms in which users must express their "identities," and in which they are asked to state their preferences with respect to gender, sexual orientation and familial status, the site strongly suggests that the "strong recommend[ation]" to "describ[e] yourself and what you are looking for in a roommate" is in essence an invitation to elaborate on discriminatory preferences already listed and to list others such as race, religion, or national origin.

In light of the objective and subjective evidence that Roommate solicits users to set forth discriminatory requirements in their "Additional Comments," I conclude that Roommate is not immune under § 230(c), and, at the very least, there is a genuine dispute of material fact as to this question. Accordingly, in no event is partial summary judgment in favor of Roommate appropriate.

IKUTA, Circuit Judge, concurring in part:

I concur in sections one and three of the majority opinion and its holding, but write separately to express my disagreement with section two.

Section 230(f)(3) defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). Although "[s]ection 230 does not preclude joint liability for the joint development of content," the present case does not require us to determine what types of conduct would make a website operator a joint information content provider. *Blumenthal v. Drudge*, 992 F. Supp. 44, 50 (D.D.C. 1998) (holding that AOL was immune from suit under the CDA, despite contracting with, and promoting the activities of, a gossip columnist and rumor monger, in the absence of evidence that AOL "had some role in writing or editing the material" in the gossip column). Therefore, there is no need for the majority's discussion of this issue. Indeed, the majority agrees that its tentative considerations in section two regarding "the outer limits of *Carafano*'s protection of websites" represents a task that we "need not undertake . . . today." In light of this acknowledgment, the majority's thoughts are unnecessary and not intended to bind future courts.

Moreover, I disagree with the direction the majority is heading in section two when it explores a possible interpretation of "information content provider." We have previously rejected expansive interpretations of this phrase and have explicitly held that a website operator does not become an information content provider by soliciting a particular type of information or by selecting, editing, or republishing such information.

For example, in *Carafano v. Metrosplash.com, Inc.*, we rejected a district court's determination that Matchmaker's

role in soliciting specific information made it an information content provider and not entitled to CDA immunity under section 230(c). 339 F.3d 1119, 1124 (9th Cir. 2003) *aff'g on other grounds* 207 F. Supp. 2d 1055 (C.D. Cal. 2002). The district court noted that Matchmaker had solicited responses to a questionnaire with "sexually charged" multiple-choice questions and answers such as "Finally, why did you call?. . . Scouting out for swinging couples . . . Looking for a one-night stand." 207 F. Supp. 2d at 1060, 1066. The district court reasoned that by providing such a tailored questionnaire, "Matchmaker contribute[d] to the content of the profiles" and thus was partly responsible "for the creation or development of information contained in the profiles." *Id.* at 1067 (internal quotation marks omitted). We disagreed, indicating that a website operator is not an "information content provider" unless it provides the "essential published content." 339 F.3d at 1124. We stated:

> Under § 230(c), therefore, so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process. The fact that some of the content was formulated in response to Matchmaker's questionnaire does not alter this conclusion. Doubtless, the questionnaire facilitated the expression of information by individual users. However, the selection of the content was left exclusively to the user.

*Id.*

We have also rejected the position that a website operator becomes an "information content provider" if it intentionally selects, edits, and publishes defamatory information. In *Batzel v. Smith*, we upheld the immunity of a website operator dedicated to "museum security and stolen art," who had received an allegedly defamatory email on this topic, and subsequently edited and republished it on the website. 333 F.3d 1018, 1021

(9th Cir. 2003). We disagreed with the analysis of the dissent in that case, which would have held that the website operator was an information content provider because

> [a] person's decision to select particular information for distribution on the Internet changes that information in a subtle but important way: it adds the person's imprimatur to it. . . . Information that bears such an implicit endorsement is no longer merely the "information provided by" the original sender. 47 U.S.C. § 230(c)(1). It is information transformed. It is information bolstered, strengthened to do more harm if it is wrongful. A defendant who has actively selected libelous information for distribution thus should not be entitled to CDA immunity for disseminating "information provided by another."

*Id.* at 1038-39 (Gould, J., concurring in part and dissenting in part).

Avoiding this broad interpretation of "information content provider," we held that immunity from " 'publisher' liability necessarily precludes liability for exercising the usual prerogative of publishers to choose among proffered material and to edit the material published while retaining its basic form and message." *Id.* at 1031. We noted that "[o]ther courts have agreed that the exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content do not transform an individual into a content provider within the meaning of § 230." *Id.* at 1031 n.18 (internal quotation marks omitted); *see also Barrett v. Rosenthal*, 146 P.3d 510, 528 (Cal. 2006) (relying on *Batzel* in reaching its conclusion that "[a] user who actively selects and posts material based on its content fits well within the traditional role of 'publisher' " and that "Congress has exempted that role from liability"). Although not expressly addressed by our case law, a "publisher's traditional editorial functions" also include seeking out and specializing in a specific type of

publication, just as in *Batzel*, where the website operator operated a website dedicated to a specific topic (museum security and stolen art). *Batzel* did not suggest that this fact made the operator an information content provider.

In sum, our binding precedent has already addressed the question when a website operator has jointly created and developed content so as to become an "information content provider." Unless a website operator directly provides "the essential published content," *Carafano*, 339 F.3d at 1124, it is not an "information content provider." The result is robust immunity under section 230(c).