16 A.3d 1113 (2010)
419 N.J. Super. 305
Anne MILGRAM, Attorney General of the State of New Jersey, and David Szuchman, Director of the State of New Jersey Division of Consumer Affairs, Plaintiffs,
v.
ORBITZ WORLDWIDE, INC., d/b/a www.cheaptickets.com and TicketNetwork, Inc., d/b/a TicketNetwork Direct, Defendants.
No. C-142-09
Superior Court of New Jersey, Law Division, Essex County.
Decided August 26, 2010.
*1116 James J. Savage, for plaintiffs (Anne Milgram, Attorney General of New Jersey, attorneys).
Peter C. Harvey, for defendant TicketNetwork, Inc., (Patterson Belknap Webb & Tyler, LLP, attorneys).
Brian R. Tipton, Phillipsburg, for defendant Orbitz Worldwide, Inc., (Florio Perrucci Steinhardt & Fader, LLC, attorneys).
PATRICIA K. COSTELLO, A.J.S.C.
This matter comes before the court by way of motions for summary judgment filed by defendants Orbitz Worldwide, LLC, TripNetwork, Inc. d/b/a Cheaptickets (collectively "Orbitz") and TicketNetwork, Inc. d/b/a TicketNetwork Direct ("TicketNetwork"). Plaintiffs, the Attorney General of New Jersey and Director of the New Jersey Division of Consumer Affairs (collectively "plaintiffs") have opposed both motions. I have reviewed the papers submitted and the arguments of counsel. The motions for summary judgment are granted.
This action arises out of certain ticket selling practices for several "Bruce Springsteen and the E Street Band" concerts scheduled for fall 2009 at Giants Stadium. Plaintiffs allege defendants offered more than 900 tickets to these shows through the http://tickets.cheaptickets.com ("Private Label Site") website on May 26, 2009, six days prior to the date TicketMaster Entertainment, Inc.[1] announced it *1117 would offer tickets for sale to the general public. Plaintiffs also allege that defendants' offering failed to inform consumers that defendants did not have the advertised tickets in their possession or control. Additionally, plaintiffs allege that at least two offered tickets had section and row numbers that did not exist in Giants Stadium.
Count one of the complaint alleges violations of New Jersey's Consumer Fraud Act, N.J.S.A. 56:8-2 ("CFA"). Count one alleges defendants violated the CFA by using or employing unconscionable commercial practices, deception, fraud, false pretense and/or misrepresentation to New Jersey consumers in the manner that tickets were advertised or sold for the Springsteen concerts. Specifically, plaintiffs allege defendants did not and could not possess the offered tickets at the time of the sale and defendants offered tickets for locations that did not exist in Giants Stadium.
Count two of the complaint alleges violations of advertising regulations, N.J.A.C. 13:45A-9.1 to 9.8, promulgated pursuant to the CFA. Plaintiffs allege defendants violated the Advertising Regulations by (1) falsely implying they had possession and control over the advertised tickets; (2) advertising the tickets for sale before they had been offered to the general public through the concert's primary distributor; and (3) advertising tickets which do not physically exist in the stadium.
On July 23, 2009 and September 3, 2009, TicketNetwork and Orbitz, respectively, moved to dismiss the complaint arguing plaintiffs' claims were preempted by federal law and failed to state a claim under the CFA. This court denied defendants' motions and permitted plaintiffs discovery to determine, among other things, defendants' role in the sale of tickets to the Springsteen concerts. The relevant material facts are as follows.
Orbitz is a global Internet based service provider, primarily in the business of providing the public with the latest technology to search, access and book a myriad of travel, vacation, and entertainment options offered by third parties. The Private Label Site is one such site owned by Orbitz. TicketNetwork owns and operates TicketNetwork Exchange, an online marketplace for buyers to locate and purchase live-event tickets directly from independent sellers on the secondary market. TicketNetwork also operates TicketNetwork Direct, which is a service sold by TicketNetwork to brokers to sell scalped tickets on the TicketNetwork Exchange. TicketNetwork sells the TicketNetwork Direct service to professional ticket sellers, allowing them to post and update their own self-acquired inventory on the TicketNetwork Exchange. The TicketNetwork Exchange gives buyers access to inventory of thousands of ticket resellers, including both professional sellers and individuals. At any time, the TicketNetwork Exchange can contain upwards of seven million different tickets offered for sale by third-party sellers.
In 2007, Orbitz and TicketNetwork entered into a contract pursuant to which the Private Label Site was listed, or enrolled, in the TicketNetwork Exchange. The terms of development and operation of the Private Label Site were made pursuant to a Private Label Site Agreement dated June 25, 2007, as amended by an Addendum to Private Label Site agreement dated October 15, 2007 (collectively, the "Agreement"). Orbitz, like TicketNetwork, does not possess any tickets for sale, but only provides access to the ticket listings posted by independent ticket sellers on the TicketNetwork Exchange.
*1118 In May 2009, the Division of Consumer Affairs began its investigation into reports of tickets to Bruce Springsteen shows at Giants Stadium being offered for sale before the public on-sale date. On May 26, 2009, a Division investigator visited the Private Label Site. The investigator purchased two tickets in Section 317, Row 29 for $110 each. TicketMaster began selling tickets to the general public for these concerts on June 1, 2009, known as the "public on-sale date." A footer appearing on the internet page the investigator purchased the tickets from stated "You are buying tickets from a third-party broker. Ticket prices are set by the seller and may differ from face value." Also displayed on the website was the following language:

General TicketNetwork Direct acts as an intermediary between buyers and ticket sellers ("TICKET SELLERS") to facilitate the purchase and sale of event tickets, and as such is not directly involved in the actual ticket sale transaction between the buyers and TICKET SELLERS. The following are the rules or "TERMS" that govern use of any TicketNetwork Direct Web Site, including this website ("SITE") by USER, the USER of the SITE ("USER"). By using or visiting the SITE, USER expressly agrees to be bound by these TERMS and to foUow these TERMS and all applicable laws and regulations governing the SITE....
Additionally, TicketNetwork and Orbitz notified prospective buyers that they could not vouch for the ticket descriptions listed in the marketplace:

Event Listings. SITE does not guarantee the accuracy of event information on SITE including but not limited to event name, event location or venue, event start time, or event date.

Ticket Availability. SITE cannot guarantee ticket availability until the USER is in possession of their tickets. Generally, all ticket listings on SITE are a unique set of tickets from an individual TICKET SELLER....
In order to encourage potential consumers to purchase tickets through the TicketNetwork Exchange, TicketNetwork provided a number of consumer protection measures. These protections were laid out in TicketNetwork's Broker Guidebook. The first of these safeguards prohibited sellers from listing "speculative" tickets, i.e., tickets the seller does not have in hand, proof-of-purchase, or the legal right to such tickets. According to the Broker Guidebook, when TicketNetwork became aware a seller had made a speculative listing of a ticket, it could remove that listing from the system. TicketNetwork's policy prohibited listing tickets before an event's on-sale date[2] unless the broker could prove they had the tickets in hand matching the section and row indicated in the uploaded data.
Second, TicketNetwork's policies required all sellers to accurately list the location of the seat printed on each ticket. Again, sellers who failed to abide by TicketNetwork's policies were subject to fines, suspensions, or termination of the use of TicketNetwork's online marketplace. Finally, TicketNetwork took the added step of providing consumers a "buyer-protection" guarantee. Specifically, a buyer of a ticket from the TicketNetwork Exchange was assured a row and seat equal to or *1119 better than the one purchased if the tickets) purchased were not valid for entry at the event, or did not arrive in time for the event. TicketNetwork guaranteed 100% reimbursement to the buyer for all money paid in the transaction.
Plaintiffs filed the complaint on May 27, 2009. On June 4, 2009, the investigator received the two tickets he purchased from the Private Label Site. The owner of Giants Stadium, the New Jersey Sports and Expedition Authority ("NJSEA"), confirmed that the tickets purchased by the investigator were originally printed and sold from an outlet on June 1, 2009. Prior to the public on-sale date, the NJSEA held back a number of seats in various sections and rows to accommodate requests from entities associated with the venue and due to contractual obligations to the band.[3]
The motion for summary judgment is made pursuant to Rule. 4:46-1. A court should grant summary judgment when:
[T]he pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.
[R. 4:46-2(c).]
This rule requires a court to "deny a summary judgment motion only where the party opposing the motion has come forward with evidence that creates `a genuine issue as to any material fact challenged.'" Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529, 666 A.2d 146 (1995) (quoting R. 4:46-2). As such, a non-moving party will see its opposition fail if it merely relies on any fact in dispute which is in the totality immaterial or of an insubstantial nature. Id. at 530, 666 A.2d 146 (citing Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75, 110 A.2d 24 (1954)). In its analysis, the motion judge is required to view the facts in a light most favorable to the non-moving party. Parks v. Rogers, 176 N.J. 491, 494, 825 A.2d 1128 (2003).
The Communications Decency Act of 1996 ("CDA"), 47 U.S.C.A. § 230 ("§ 230") provides that no provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider. 47 U.S.C.A. § 230(c)(1). An "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the internet." 47 U.S.C.A. § 230(f)(2). An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C.A. § 230(f)(3). The prototypical service qualifying for this statutory immunity is an online messaging board (or bulletin *1120 board) on which Internet subscribers post comments and respond to comments posted by others. See Zeran v. Am. Online, Inc., 129 F.3d 327 (4th Cir.1997) (discussing operation of messaging board and holding that it was "clearly protected by § 230's immunity"), cert. denied, 524 U.S. 937, 118 S.Ct. 2341, 141 L.Ed.2d 712 (1998).
The CDA also preempts state law. "In a clear exercise of its Commerce Power, Congress preempted any contrary state law provisions: `No cause of action may be brought and no liability may be imposed under any state or local law that is inconsistent with this section.'" Donato v. Moldow, 374 N.J.Super. 475, 486, 865 A.2d 711 (App.Div.2005) (quoting 47 U.S.C.A. § 230(e)(3)). In passing the Act, Congress intended "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C.A. § 230(b)(2). Because of this provision and Congress' expressed desire to promote unfettered speech on the Internet, the sweep of § 230 preemption includes common law causes of action. Zeran, supra, 129 F.3d at 334.
By its plain language, the CDA creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service. Donato, supra, 374 N.J.Super. at 490, 865 A.2d 711 (quoting Zeran, supra, 129 F.3d at 330-31). Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions, such as deciding whether to publish, withdraw, postpone or alter content, are barred. Id. at 490, 865 A.2d 711.
The dispositive issues here are as follows: (1) whether defendants are providers or users of an interactive computer service; and (2) whether, by their conduct, defendants were information content providers with respect to the alleged defective tickets at issue. If defendants are information service providers and not also information content providers, defendants' motions for summary judgment will be granted.
Defendants' primary argument is that plaintiffs' state law claims arising under the CFA are preempted by the CDA. Defendants claim that the content at issue, i.e., the description of the tickets posted for sale on the TicketNetwork Exchange, was created by third-party sellers, and not defendants, thus allowing defendants shelter under the CDA's immunity provisions. In return, plaintiffs' argument is two-fold. First, plaintiffs argue that § 230 does not immunize defendants because plaintiffs' claims treat defendants as "commercial actors," and not as speakers or publishers of the alleged offending content. Second, plaintiffs contend defendants were more than passive in their role as website operators and have actively participated in the selective editing and deleting of website content, namely, providing logos, navigational tools and the highlighting of events. As a result, plaintiffs submit that the CDA's immunity provisions are unavailable to defendants because they qualify as "information content providers" under the Act.
The language of § 230 sets forth three criteria to qualify for the immunity provided. First, immunity is available only to a "provider or user of an interactive computer service." 47 U.S.C.A. § 230(c)(1). Second, the liability must be based on the defendant having acted as a "publisher or speaker." Ibid. Third, immunity can be claimed only with respect to *1121 "information provided by another information content provider." Ibid.
There is no issue that defendants qualify as an "interactive computer service" as defined by the CDA. Defendant Orbitz is a global Internet-based service provider primarily in the business of providing the public with the latest technology to search, access, and book a myriad of travel, vacation, and entertainment options offered by third parties. Defendant TicketNetwork owns and operates TicketNetwork Exchange, a secure online marketplace for buyers to locate and purchase live-event tickets directly from independent sellers on the secondary market. Large, commercial ISPs fit the "interactive computer service" definition in the CDA. See Ben Ezra, Weinstein, and Co., Inc. v. Am. Online, Inc., 206 F.3d 980 (10th Cir.), cert, denied, 531 U.S. 824, 121 S.Ct. 69, 148 L.Ed.2d 33 (2000). Website operators are also included. See Carafano v. Metrosplash.com, Inc., 339 F.3d 1119 (9th Cir.2003) (subscription-based dating website); Gentry v. eBay, Inc., 99 Cal. App.4th. 816, 121 Cal.Rptr.2d 703 (2002) (auction website); Schneider v. Amazon.com, Inc., 108 Wash.App. 454, 31 P.3d 37 (2001) (bookstore website). This prong requires no further discussion.
The cause of action most frequently associated with the cases on § 230 is defamation. See, e.g., Carafano, supra, 339 F.3d 1119; Batzel v. Smith, 333 F.3d 1018 (9th Cir.2003), cert, denied, 541 U.S. 1085, 124 S.Ct. 2812, 159 L.Ed.2d 246 (2004). However, many causes of action can be premised on the publication or speaking of what can be called "information content." A provider of information services might get sued for violating anti-discrimination laws, see, e.g., Fair Housing Council v. Roommates.com, LLC, 521 F.3d 1157 (9th Cir.2008); for fraud, negligent misrepresentation, and ordinary negligence, see, e.g., Doe v. MySpace, Inc., 528 F.3d 413 (5th Cir.2008), cert, denied, ___ U.S. ___, 129 S.Ct. 600, 172 L.Ed.2d 456 (2008); for false light, see, e.g., Flowers v. Carville, 310 F.3d 1118 (9th Cir.2002); or even for negligent publication of advertisements that cause harm to third parties, see, e.g., Brawn, v. Soldier of Fortune Magazine, Inc., 968 F.2d 1110 (11th Cir.1992). Thus, what matters is not the name of the cause of action, but rather whether the cause of action inherently requires the court to treat the defendant as the "publisher or speaker" of content provided by another. Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1102 (9th Cir.2009). To put it another way, courts must ask whether the duty the plaintiff alleges defendant violated derives from defendant's status or conduct as a "publisher or speaker." If it does, § 230 precludes liability. Ibid.
Plaintiffs argue the CDA does not apply because plaintiffs' claims treat defendants as "commercial actors" and not as "publishers or speakers." A similar argument was rejected in Barnes, supra, 570 F.3d at 1102, where plaintiff argued the CDA did not apply to its negligent undertaking claim "because [the claim] treats Yahoo! not as a publisher, but rather as one who undertook to perform a service and did it negligently." The Ninth Circuit concluded the CDA covers "any activity that can be boiled down to deciding whether to exclude material third parties seek to post online." Ibid, (citing Roommates.com, supra, 521 F.3d at 1170-71). Although not binding, the Ninth Circuit's analysis of this argument is persuasive.
Labeling defendants' conduct as "commercial," rather than as performed by "publishers or speakers," because defendants charge a "service" or "administrative" fee to third-party ticket sellers, does not remove defendants' conduct from the *1122 reach of the CDA. In fact, the plain language of § 230 was designed to "promote the development of e-commerce," and more specifically, "to prevent lawsuits from shutting' down websites and other services on the Internet." Donato, supra, 374 N.J.Super. at 494-95, 865 A2d 711 (quoting Batzel, supra, 333 F.3d at 1027-28). The fact that defendants charge "service" or "administrative" fees is irrelevant to the CDA analysis. Plaintiffs seek to enjoin defendants from "advertising and selling concert tickets to consumers without actually having those tickets in their possession or control." This conduct, however, fits squarely within the CDA's purview. See Jurin v. Google Inc., 695 F.Supp.2d 1117 (E.D.Cal.2010) (holding that Google's "Sponsored Link" advertisements program is protected by the CDA irrespective of the fact that Google "charges for its service" because Google does not "provide the content" of the advertisements).
A decision on plaintiffs' second argument, that defendants qualify as "information content providers" under the Act, requires a closer review. In order to reach a determination on this issue, analysis and discussion of the Appellate Division opinion in Donato, supra, 374 N.J.Super. at 479, 865 A 2d 711 as well as several other cases on point is instructive.
Section 230 has been the subject of one reported New Jersey case. In the seminal case of Donato, supra, 374 N.J.Super. 475, 865 A2d 711, the Appellate Division was presented with the question of whether an operator of a website was potentially liable because he published defamatory statements made by third parties on a discussion forum contained in his website. The plaintiffs, two elected members of the Emerson Borough Council, became angry because of an anonymous posting of defamatory messages on defendant Moldow's electronic bulletin board site. Id. at 479, 865 A 2d 711. Moldow controlled the content of the bulletin board by various methods, including selectively deleting offensive messages, banning disruptive users, and actively editing messages before publication. Id. at 483, 865 A2d 711. The plaintiffs in Donato claimed that Moldow controlled the content of the discussion forum, thus shaping it, as a result of which he was transformed into an "information content provider" as defined by the CDA. Id. at 483-84, 865 A2d 711. He accomplished this, according to the plaintiffs, by selectively choosing which messages to delete and which to leave posted. Id. at 484, 865 A2d 711.
In deciding that conduct did not make Moldow an "information content provider," the court noted the activities were nothing more than the exercise of a publisher's traditional editorial functions, namely, whether to publish, withdraw, postpone or alter content provided by others. Id. at 498, 865 A 2d 711 (citing Zeran, supra, 129 F.3d at 330). The Appellate Division concluded this was the very conduct Congress chose to immunize by § 230. Ibid.
Additionally, in considering whether Moldow's conduct in "shaping" the content of the discussion forum could be equated with responsibility for the "development" of the defamatory messages, the Appellate Division considered Congress' purposes in enacting § 230:
Whether wisely or not, [Congress] made the legislative judgment to effectively immunize providers of interactive computer services from civil liability in tort with respect to material disseminated by them but created by others. In recognition of the speed with which information may be disseminated and the near impossibility of regulating information content, Congress decided not to treat providers of interactive computer services *1123 like other information providers such as newspapers, magazines or television and radio stations, all of which may be held liable for publishing or distributing obscene or defamatory material written or prepared by others. While Congress could have made a different policy choice, it opted not to hold interactive computer services liable for their failure to edit, withhold or restrict access to offensive material disseminated through their medium.
[Id. at 492, 865 A.2d 711 (citing Blumenthal v. Drudge, 992 F.Supp. 44, 49 (D.D.C.1998)).]
Indeed, the court noted that "Congress has made a different policy choice by providing immunity even where the interactive service provider has an active, even aggressive role in making available content prepared by others." Ibid, (citing Blumenthal, supra, 992 F.Supp. at 52). Interpreting the terms "creation" and "development," as used in the CDA's definition of an "information content provider," the court held that "development requires material substantive contribution to the information that is ultimately published." Id. at 500, 865 A.2d 711; see also Batzel, supra, 333 F.3d 1018 (holding that the "development of information" ... means something more substantial than merely editing portions of an e-mail and selecting material for publication). The Donato court's interpretation of the term "information content provider," as well as the public policy behind the CDA (to encourage Internet services that increase the flow of information by protecting them from liability when independent persons negligently or intentionally use those services to supply harmful content) thus support a narrow construction of this phrase. See Carafano, supra, 339 F.3d at 1123 ("[Reviewing courts have treated § 230(c) immunity as quite robust, adopting a relatively expansive definition of `interactive computer service' and a relatively restrictive definition of `information content provider...."').
Similarly, the Ninth Circuit in Carafano rejected the claim that the operator of the subscription-based website, Matchmaker.com, was an "information content provider." Carafano provides a useful comparison. The website at issue in that case enabled users to locate and communicate with others with compatible romantic interests. Id. at 1121. Members would submit their profile by answering a detailed questionnaire and providing photographs. Ibid. Before posting the profiles, Matchmaker reviewed the photographs for impropriety, but did not review the profiles themselves. Ibid. An unknown person, pretending to be the plaintiff, posted a profile purportedly of her, including her home address and an indirect means of obtaining her home telephone number. Ibid. Carafano then began receiving sexually-explicit and otherwise disturbing phone calls. Id. at 1121-22. Carafano sued Matchmaker, asserting defamation, invasion of privacy, and other claims. The Ninth Circuit held that Matchmaker was not an "information content provider" with respect to the offending content and was therefore immune under § 230. Id. at 1124-25.
Carafano argued that by providing the questionnaire, which, with the answers provided by a third party, was then posted and became the profile, Matchmaker participated in the "development" of the information and was thus an information content provider. Carafano pointed to the "pre-prepared responses" of the multiple choice questions and the structure by which Matchmaker formatted the array of user-supplied information into detailed, searchable personal profiles, thus developing and shaping the content.
*1124 The court rejected these arguments, stating that so long as the "essential" published content was provided by a third party, "[t]he interactive service provider receives full immunity regardless of the specific editing or selection process." Id. at 1124. "The fact that some of the content was formulated in response to Matchmaker's questionnaire does not alter this conclusion." Ibid. The Ninth Circuit then concluded that Matchmaker's conduct "did not play a significant role in creating, developing or `transforming' the relevant information." Id. at 1125.
The Agreement between Orbitz and TicketNetwork required that "[t]he Private Label Site shall only display the marks, designs, and logos stipulated by Orbitz." Also, "[t]he Private Label Site shall include the font, colors, headers, footers and overall design elements of the Orbitz Sites.... Orbitz' name, mark, persistent navigation and return links to the Orbitz Sites shall be prominently displayed above the fold on each page where the header permits persistent navigation of the Private Label Site." In the course of the site's development, Orbitz provided Ticket-Network with logos and design elements for the Private Label Site.
Further, the Agreement gave Orbitz "the right to request the removal of any content or offering from the Private Label Site by providing such request to [Ticket-Network]...." TicketNetwork also agreed to provide Orbitz, "the ability to manage content, including URL's, static content, meta data and tracking tags, via content management application." Consistent with this provision, TicketNetwork gave Orbitz the authority to insert text on the Private Label Site to describe specific shows or sporting events. Orbitz also has the ability to insert links to tickets for specific artists and different text on the site's pages and create links to ticket offerings for specific artists. Orbitz also retained the ability to control the price at which tickets were offered to users of the Private Label Site.
Pursuant to the Agreement, TicketNetwork would send confirmatory emails to customers who bought tickets on the Private Label Site. Orbitz approved the form of the TicketNetwork confirmation email before the Private Label Site was launched. TicketNetwork would then process all credit card transactions made on the Private Label Site. TicketNetwork also provided customer service inquiries for customers who purchased tickets on the Private Label Site.
TicketNetwork was responsible for managing brokers whose tickets were listed on the Private Label Site. TicketNetwork would approve brokers before they could post tickets for sale on the TicketNetwork Exchange. TicketNetwork also verified all event postings against the primary ticketing source to ensure accuracy of the event name, event date and event time. If the information in a broker's listing could not be verified or was incorrect, TicketNetwork would send the broker an email requesting verification.
Although the Donato and Carafano cases dealt with website operators faced with claims of defamation, and the instant case deals with ticket sales, the reasoning in those cases is equally applicable here. The roles that Moldow and Matchmaker played in selecting the content to publish and creating and providing questionnaires, respectively, is analogous to the role that Orbitz and TicketNetwork play here with regard to publishing third-party postings on its websites. Plaintiffs contend defendants are information content providers with respect to the alleged inaccurate or misleading ticket listings by virtue of the manner in which they conducted the website because they were "responsible, in *1125 whole or in part, for the creation or development of information provided." 47 U.S.C.A. § 230(f)(3). By plaintiffs' reasoning, this would make defendants authors, for which § 230 does not provide immunity, rather than publishers, for which it does.
Plaintiffs' focus on the creation, development and operation of the Private Label Site, however, is misplaced. As the Ninth Circuit pointed out in Carafano, the critical inquiry is whether the "essential published content" was provided by "another information content provider." Here, the "essential published content" is the offer of alleged misleading or inaccurate tickets, not the navigational, logo and design elements included on the Private Label Site. Following the approaches from Donato, Carafano, and other federal decisions interpreting the CDA's immunity provisions, I am satisfied defendants cannot be deemed information content providers with respect to the alleged inaccurate or misleading ticket listings. The actions pointed to by plaintiff are nothing more than the exercise of a publisher's traditional editorial functions.
The totality of the record establishes defendants were not responsible, in whole or in part, for the creation or development of the alleged inaccurate or misleading ticket listings. This information originated not from defendants but from another information content provider, namely the third-party sellers using defendants' websites. As a provider of an interactive computer service that served as a conduit for information provided by another information content provider, defendants are afforded the broad immunity under the CDA. There was no material, substantive contribution to the ticket listings by defendants. Simply put, defendants' actions do not constitute "development, in whole or in part" within the meaning of § 230. Defendants' conduct does not transform them into "information content providers" under the CDA.
The facts of this case can be distinguished from those in the Ninth Circuit's decision in Roommates.com, supra, 521 F.3d 1157. In that case, two California Fair Housing Councils sued Roommates.com, an online roommate-matching service, for violating the Fair Housing Act, 42 U.S.C. § 3601 to 3619, and California anti-discrimination laws. Id. at 1162. The Ninth Circuit concluded that Roommates.com was not entitled to immunity under § 230. The decision, however, was based solely on the fact that the offending content on the website was in fact supplied by Roommates.com itself. Specifically, it was Roommates.com that, in violation of federal and California state housing law, required potential subscribers to identify their sex, sexual orientation, and family status, and to indicate their preferred sex, sexual orientation, and family status in a roommate. Id. at 1161-62. The Roommates.com holding is particularly instructive:
Here, the part of the profile that is alleged to offend the Fair Housing Act and state housing discrimination laws the information about sex, family status and sexual orientationis provided by subscribers in response to Roommate's questions, which they cannot refuse to answer if they want to use defendant's services. By requiring subscribers to provide the information as a condition of accessing its service, and by providing a limited set of pre-populated answers, Roommate becomes much more than a passive transmitter of information provided by others; it becomes the developer, at least in part, of that information. And § 230 provides immunity only if the interactive computer service does not *1126 "creat[e] or develop[]" the information "in whole or in part."
[Id. at 1166 (quoting 47 U.S.C.A. § 230(f)(3)).]
Thus, the linchpin of the Ninth Circuit's decision was the fact that Roommates.com was actively participating in creating the objectionable content, i.e., by providing the illegal questions and by requiring users to answer them.
In this case, unlike Roommates.com, defendants do not supply the content to which plaintiffs object, the inaccurate or misleading ticket listings. Defendants simply provide the interface for accessing that content and provide links so customers can easily navigate amongst the different entertainment options. Defendants do not ask ticket sellers to provide any information for any unlawful purpose, nor have they designed their Internet marketplace to violate any federal or state laws. At best, defendants are guilty of "passive acquiescence in the misconduct of its users," and, even under Roommates.com, defendants are entitled to immunity under § 230. Id. at 1169 n. 24 ("Insofar, however, as a plaintiff would bring a claim under state or federal law based on a website operator's passive acquiescence in the misconduct of its users, the website operator would likely be entitled to CDA immunity. This is true even if the users committed their misconduct using electronic tools of general applicability provided by the website operator."); Barnes, supra, 570 F.3d at 1103 (9th Cir.2009) (finding Yahoo! immune from liability for claim that it failed to remove defamatory profile even after receiving specific notice that the profile was fraudulent); Atl. Recording Corp. v. Project Playlist, Inc., 603 F.Supp.2d 690, 701-02 (S.D.N.Y.2009) ("passive acquiescence in the misconduct of its users," is not enough to lose immunity under the CDA).
Plaintiffs' reliance on NPS, LLC v. StubHub, Inc., 25 Mass.L.Rptr. 478, 2009 WL 995483 (Mass.Super.Ct.2009) is similarly misplaced. As a trial level decision from another jurisdiction, it is not binding. StubHub held that the host site was an information content provider:
However, CDA immunity "applies only if the interactive computer service provider is not also an `information content provider,' which is defined as someone who is `responsible, in whole or in part,' for the creation or development of the offending content." Roommates, 521 F.3d at 1162; 47 U.S.C. § 230(f)(3). The Ninth Circuit has interpreted the term "development" as "referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness. In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct." Roommates, 521 F.3d at 1167-68. Here, as discussed earlier, there is evidence in the record that StubHub materially contributed to the illegal "ticket scalping" of its sellers. In effect, the same evidence of knowing participation in illegal "ticket scalping" that is sufficient, if proven, to establish improper means is also sufficient to place StubHub outside the immunity provided by the CDA.
[Id. at 485 (emphasis added).]
The characterization appears to be based on the fact that StubHub allowed the postings of illegally scalped tickets on its website. It is, quite frankly, unclear as to which facts the court used in reaching the conclusion that § 230 did not apply. To the extent, however, that the StubHub court relied upon the site's listing of the tickets, masking the exact location seat, or knowingly allowing sellers to post tickets for sale in violation of local statutes, it is in *1127 contradiction with the spirit of Donato and cannot be relied upon by this court.
Defendants' services help to create and maintain a vibrant, competitive, market for consumers looking to purchase travel and entertainment related products and services online. As a result, defendants' services are consistent with Congress' intent to encourage commerce over the Internet and ensure interactive computer services are not held responsible for how third parties use their services. Accordingly, defendants' motions for summary judgment are granted as plaintiffs' state law claims are barred by the CDA. It therefore becomes unnecessary to address the parties' arguments regarding the CFA.
NOTES
[1] TicketMaster Entertainment, Inc. was the primary ticketing agency for the Bruce Springsteen concerts at Giants Stadium.
[2] As used in TicketNetwork's Broker Handbook, the "on-sale date" includes: (1) the date on which a venue and its primary ticketing agency release concert tickets for sale to the general public; (2) the date on which a venue makes tickets available to the public through a special "pre-sale;" and (3) the date on which a venue or band would make tickets available for sale through fan clubs.
[3] Bruce Springsteen's management policies prohibited any tickets the band was allotted from being sold publicly or privately prior to the official public on-sale date. It is unknown whether tickets held back for other entities associated with the venue enforced any similar policies. Further, the specifics of the ticket requests made to the NJSEA prior to the public on-sale date are not known by this court. The NJSEA destroyed the relevant documents in late 2009.